90 P.3d 659 (2004)
PORT OF SEATTLE, a port district of the State of Washington, Petitioner,
v.
The POLLUTION CONTROL HEARINGS BOARD, an agency of the State of Washington, Respondent,
Airport Communities Coalition; Citizens Against Seatac Expansion; and State of Washington, Department of Ecology, an agency of the State of Washington, Respondents/Cross-Petitioners.
No. 73419-4.
Supreme Court of Washington, En Banc.
Argued November 18, 2003.
Decided May 14, 2004.
*665 Peter J. Eglick, Michael P. Witek, Helsell Fetterman LLP, Seattle, Rachel Paschal Osborn, Spokane, Lind J.N. Strout, Roger A. Pearce, Patrick J. Mullaney, Foster Pepper & Sheffelman PLLC, Kevin L. Stock, Starbucks Coffee Company, Richard Arthur Poulin, Smith & Lowney, PLLC, Traci Marie Goodwin, Gillis Edward Reavis, Brown Reavis & Manning PLLC, Seattle, for Petitioners.
Jean Marie Wilkinson, Attorney Generals Office, Olympia, Jeff B. Kray, Marten Law Group, Seattle, Joan Margaret Marchioro, Sharonne E. O'Shea, Thomas J. Young, Wa. State Atty. General's Office, Olympia, for Respondents.
Shirley Waters Nixo, Karen Allston, Center for Environmental Law & Policy, Seattle, Kevin Allen Klingbeil, Denver, Co., for Amicus Curiae (Center for Environmental Law & Policy).
Richard Adam Smith, William Hamilton Rodgers, U of Washington, Richard Arthur Poulin, Smith & Lawney PLLC, Seattle, for Amicus Curiae, Citizens Against SEATAC Expansion, Citizens for a Healthy Bay, Columbia Riverkeeper, Friends of Grays Harbor, Kettle Range Conservation Group, Lands Council, Okanogan Highland Alliance, Okanogan Wilderness League.
William Hamilton Rodgers, U of Washington, Seattle, for Amicus Curiae People for Puget Sound.
Richard Arthur Poulin, Smith & Lowney PLLC, William Hamilton Rodgers, U of Washington, Seattle, for Amicus Curiae Public Employees for Environmental Responsibility, Puget Soundkeeper Alliance.
Richard Adam Smith, William Hamilton Rodgers, U of Washington, Seattle, for Amicus Curiae Resources for Sustainable Communities.
Richard Arthur Poulin, Smith & Lowney PLLC, William Hamilton Rodgers, U of Washington, Seattle, for Amicus Curiae Sierra Club.
Richard Adam Smith, William Hamilton Rodgers, U of Washington, Seattle, for Amicus Curiae Washington Toxics Coalition, and Waste Action Project. *660 *661 *662 *663
*664 BRIDGE, J.
Construction of the third runway at the Seattle-Tacoma International Airport (Sea-Tac) will require placing fill into area wetlands. Before the Army Corps of Engineers may issue a permit to fill wetlands, the project proponent must obtain certification from the State, pursuant to § 401 of the Clean Water Act (33 U.S.C. § 1341), stating that there is reasonable assurance that the project will not violate applicable state water quality standards. On September 21, 2001, the Washington State Department of Ecology issued a § 401 water quality certification to the Port of Seattle (Port) for the third runway project. The Airport Communities Coalition (ACC) appealed the certification to the Pollution Control Hearings Board (PCHB). After a lengthy hearing, the PCHB affirmed the certification but added 16 new conditions it deemed necessary for reasonable assurance that state water quality standards would be met. All parties appealed and this court accepted direct review of the PCHB decision. We conclude that there is reasonable assurance that the third runway project will not violate state water quality standards. We uphold some of the PCHB's additional conditions but reverse others.

I

Facts and Procedural History
In 1996, after years of study and debate, the Puget Sound Regional Council determined that a third runway was needed at SeaTac. In response, the Port developed a master plan update for SeaTac, which includes a new 8,500-foot parallel runway to be constructed in the Miller Creek, Walker Creek, and Des Moines Creek watersheds. All three creeks are classified as class AA waters, affording them the highest protection available in the state. The third runway project will fill all or portions of 50 wetlands within those watersheds. The PCHB found:

*666 The site of the proposed Third Runway is currently a wooded canyon encompassing Miller Creek, the bottom of which lies approximately 150 feet below the level of the Airport's existing runways. To provide the site for the Third Runway, the Port proposes to fill the canyon with over twenty (20) million cubic yards of fill.
PCHB Findings of Fact, Conclusions of Law, and Order at 12 (PCHB Dec). On October 25, 2000, the Port submitted a joint aquatic resource permit application (JARPA) to the Army Corps of Engineers and to the Washington State Department of Ecology (Ecology), pursuant to § 404 of the Clean Water Act (33 U.S.C. § 1344). The Port's JARPA also constituted an application to Ecology for certification that the Port's plan complies with applicable water quality laws, as required by § 401 of the Clean Water Act (33 U.S.C. § 1341).[1]
The Port submitted to Ecology numerous reports and studies on the impact of the third runway on various aspects of water quality. Ecology conducted a series of public hearings and proceeded with an in depth review of the Port's plan. Ecology issued a § 401 certification on August 10, 2001, and ACC and the Port appealed that certification to the PCHB. After negotiations between the Port and Ecology, Ecology rescinded its August certification and issued a new § 401 certification on September 21, 2001. Ecology issued the new § 401 certification as an order under chapter 90.48 RCW, thereby ensuring that its conditions would be enforceable, independent of the federal § 404 permit. The ACC again appealed the § 401 certification to the PCHB.
In December 2001, the PCHB granted ACC's motion to stay the effectiveness of the certification and Citizens Against SeaTac Expansion (CASE) successfully intervened. The PCHB held a 10-day hearing in March 2002. The PCHB admitted written direct testimony, portions of deposition testimony, and numerous exhibits. After an in depth review of the nearly 58,000-page record, the PCHB issued a 139-page decision on August 12, 2002, including findings of fact and conclusions of law. The PCHB affirmed Ecology's § 401 certification but added 16 new conditions which the PCHB deemed necessary for reasonable assurance.[2] Several conditions *667 are not challenged here and therefore stand.[3]
The Port filed a petition for judicial review of the PCHB decision in King County while ACC and CASE and Ecology filed separate petitions for judicial review in Thurston County. All of the cases were transferred to King County and consolidated.
The Port immediately filed a motion for direct review at Division One of the Court of Appeals, and the Court of Appeals certified all motions for discretionary review to this court. All parties urged this court to review the PCHB decision directly. This court accepted certification and granted discretionary review on March 6, 2003.
In the meantime, on December 13, 2002, the Army Corps of Engineers issued a federal Clean Water Act § 404 permit to the Port, incorporating Ecology's certification and 7 of the PCHB's 16 conditions. Airport Cmtys. Coalition v. Graves, 280 F.Supp.2d 1207, 1211, 1214 (W.D.Wash.2003).[4] The ACC sought review of the Army Corps' certification in federal court, arguing that the Corps acted arbitrarily and capriciously when it failed to incorporate all of the PCHB's conditions. On August 18, 2003, Judge Rothstein of the United States District Court granted summary judgment in the Corps' favor. Judge Rothstein concluded that it was within the Corps' discretion to accept or reject the PCHB's conditions because those conditions arose outside of the one-year time frame for state certification imposed by § 401 of the Clean Water Act. Judge Rothstein further noted that the Corps district engineer, in his discretion, may modify the § 404 permit to incorporate additional conditions upon conclusion of this court's review. The federal court may then again review the engineer's decision. Moreover, the Graves court noted that the state of Washington can take measures to ensure its continued involvement, including issuing the § 401 certification, "in the form of an independently enforceable order such that at the end of the judicial review process, there are independent state requirements above and beyond the federal requirements." Id. at 1217.
In sum, the federal court did not require that the Army Corps adopt any PCHB conditions affirmed by this court. However, the § 401 certification was issued as an independently enforceable state order under chapter 90.48 RCW, and the PCHB decision merely added conditions to that order. Thus, all unchallenged PCHB conditions and those affirmed by this court must be incorporated into the § 401 certification by Ecology and are independently enforceable under state law.

II

Issues and Summary of Conclusions
A. Deference and Scope of Review
1. What level of deference is due Ecology where Ecology and the PCHB disagree? *668 With regard to each challenge to a § 401 certification, the PCHB must determine as a threshold matter whether the § 401 certification provides reasonable assurance that state water quality standards will be met. The PCHB may create an additional condition only after it has concluded that the § 401 certification is inadequate to protect water quality. Ecology's interpretations of water quality statutes and its own regulations are entitled to great weight. A PCHB factual finding will not be overturned unless it is clearly erroneous, but deference will be given to Ecology on technical issues based on Ecology's specialized expertise.
2. Did the PCHB apply the proper scope of review? The PCHB did not erroneously interpret or apply the law or act contrary to agency rule when it considered plans, reports, and studies that were not available to Ecology. The scope of PCHB review is truly de novo, subject to established discovery deadlines.
B. Reasonable Assurance in Light of Conditions, Monitoring, and Adaptive Management
1. Did the PCHB properly add conditions to the § 401 certification to reach reasonable assurance, rather than overturning the § 401 certification in its entirety? The PCHB can add conditions to a § 401 certification if conditions are required to reach reasonable assurance.
2. Can reasonable assurance exist where Ecology required future submission of plans, reports, and studies? Ecology and the PCHB can rely on future submissions of revised plans, reports, and studies, so long as their implementation and anticipated outcome meet the reasonable assurance test.
3. Can reasonable assurance exist where compliance with current and future National Pollutant Discharge Elimination System (NPDES) permits is required? Ecology and the PCHB did not err when they relied upon current and future NPDES permits in the § 401 certification for reasonable assurance.
4. Can reasonable assurance exist in light of monitoring and adaptive management? Ecology and the PCHB did not err when they relied on monitoring and adaptive management for reasonable assurance. In sum, Ecology and the PCHB properly found that there is reasonable assurance that the third runway project will meet state water quality standards.
C. Low Flow Mitigation
1. Did the PCHB err in its determination that the planned low flow mitigation would be adequate? The PCHB did not err in concluding that the Port's low flow mitigation plan is adequate and feasible.
2. Did the PCHB err when it required, in condition 6, that the Port maintain a baseline flow in Des Moines Creek of one cubic foot per second? The PCHB erroneously interpreted and applied the law when it required the Port to do more than offset the impact of the third runway; thus, condition 6 is overturned.
3. Did the PCHB err in requiring the Port, in condition 16, to obtain a water right to manage stormwater for low flow mitigation? Washington law does not require a water right for the Port's low flow offset plan; thus, condition 16 is overturned.
D. Fill Criteria
1. Did the PCHB err by imposing, in condition 7, more stringent numeric fill criteria than were imposed by Ecology? Condition 7 is overturned but Ecology is required to recalculate fill criteria for selenium and silver based on correct practical quantitation limits and set fill criteria for total petroleum hydrocarbons at 0.
2. Was the Synthetic Precipitation Leaching Procedure (SPLP), a laboratory leaching procedure, properly validated by the legislature when it passed LAWS OF 2003, ch. 210? Retroactive application of chapter 210 to this case is proper and does not violate the separation of powers doctrine. ACC and CASE have not shown that chapter 210 is unconstitutional special legislation. Finally, chapter 210 is not preempted by the federal Clean Water Act. Still, Ecology must amend the § 401 certification to require the Port to compare SPLP leachate against both surface and groundwater quality criteria.
*669 E. Water Quality and Stormwater
1. Did the PCHB err in affirming Ecology's authorization of mixing zones for instream work as conditioned by the § 401 certification? The PCHB's conclusion with regard to mixing zones is affirmed.
2. Did the PCHB err when it imposed condition 5, allowing use of Water Effects Ratio (WER) studies only to make water quality standards more stringent? PCHB condition 5 is overturned.
F. Wetland Mitigation
1. Was the wetland mitigation plan, as amended by Ecology and the Port, sufficient with regard to Vacca Farm? Ecology and the PCHB properly counted proposed work at the Vacca Farm site as restoration.
2. Did the PCHB err in refusing to count out-of-basin mitigation until in-basin options were properly considered? The final sentence in PCHB condition 11 is overturned. Counting in-basin and out-of-basin mitigation, the Port's plan adequately mitigates for the impacts of the third runway.
G. Evidentiary Rulings
1. Did the PCHB err in selectively redacting depositions of Ecology officials? The PCHB acted within its discretion when it redacted the deposition testimony at issue.
2. Is ACC entitled to relief based on its claim that the PCHB improperly excluded from the record an inadvertently disclosed privileged document? ACC was not prejudiced by the exclusion of the inadvertently disclosed document and thus is not entitled to relief.

III

Standard of Review
This court reviews PCHB orders under the Washington Administrative Procedure Act (WAPA). Pub. Util. Dist. No. 1 of Pend Oreille County v. Dep't of Ecology, 146 Wash.2d 778, 789-90, 51 P.3d 744 (2002); see also RCW 34.05.514(3), . 518(1), (3)(a). Our review of the facts is confined to the record before the PCHB. RCW 34.05.558. "The burden of demonstrating the invalidity of agency action is on the party asserting invalidity." RCW 34.05.570(1)(a). Here, we may grant relief in three circumstances.
This court may grant relief if we find that the PCHB order is "outside the statutory authority or jurisdiction of the [PCHB]" or if the PCHB has "erroneously interpreted or applied the law." RCW 34.05.570(3)(b), (d). Where statutory construction is necessary, this court will interpret statutes de novo. Pub. Util. Dist. No. 1, 146 Wash.2d at 790, 51 P.3d 744. However, if an ambiguous statute falls within the agency's expertise, the agency's interpretation of the statute is "accorded great weight, provided it does not conflict with the statute." Id. This court may also grant relief if the PCHB's order is inconsistent with an agency rule, unless the agency provides facts and reasons to demonstrate a rational basis for the inconsistency. RCW 34.05.570(3)(h).
In addition, this court may grant relief if the PCHB's order is "not supported by evidence that is substantial when viewed in light of the whole record before the court." RCW 34.05.570(3)(e). In reviewing an agency's findings of fact, this court has described the "substantial evidence" test as whether the record contains "`a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order.'" King County v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd., 142 Wash.2d 543, 553, 14 P.3d 133 (2000) (quoting Callecod v. State Patrol, 84 Wash.App. 663, 673, 929 P.2d 510 (1997)). We should overturn an agency's factual findings only if they are clearly erroneous, Schuh v. Department of Ecology, 100 Wash.2d 180, 183, 667 P.2d 64 (1983), and we are "definitely and firmly convinced that a mistake has been made." Buechel v. Dep't of Ecology, 125 Wash.2d 196, 202, 884 P.2d 910 (1994). We do not weigh the credibility of witnesses or substitute our judgment for the PCHB's with regard to findings of fact. Bowers v. Pollution Control Hr'gs Bd., 103 Wash.App. 587, 596, 13 P.3d 1076 (2000); review denied, 144 Wash.2d 1005, 29 P.3d 717 (2001).
Where a party challenges the PCHB's application of the law to a particular *670 set of facts, "the factual findings of the agency are entitled to the same level of deference which would be accorded under any other circumstance." Tapper v. Employment Sec. Dep't, 122 Wash.2d 397, 403, 858 P.2d 494 (1993). However, "[t]he process of applying the law to the facts ... is a question of law and is subject to de novo review." Id; see also Franklin County Sheriff's Office v. Sellers, 97 Wash.2d 317, 329-30, 646 P.2d 113 (1982) (explaining that mixed questions of law and fact, also known as problems of application of law to facts, are subject to de novo review, meaning the court must determine the correct law independent of the agency's decision and then apply the law to established facts de novo).
Finally, this court may grant relief if the agency's order is "arbitrary or capricious." RCW 34.05.570(3)(i). "This court has defined arbitrary or capricious agency action as action that `"is willful and unreasoning and taken without regard to the attending facts or circumstances."'" Wash. Indep. Tel. Ass'n v. Wash. Utils. Transp. Comm'n, 149 Wash.2d 17, 26, 65 P.3d 319 (2003) (quoting Rios v. Dep't of Labor Indus., 145 Wash.2d 483, 501, 39 P.3d 961 (2002) (quoting Hillis v. Dep't of Ecology, 131 Wash.2d 373, 383, 932 P.2d 139 (1997))). Where there is room for two opinions, and the agency acted honestly and upon due consideration, this court should not find that an action was arbitrary and capricious, even though this court may have reached the opposite conclusion. See Buechel, 125 Wash.2d at 202, 884 P.2d 910. This court should not "undertake to exercise the discretion that the legislature has placed in the agency." RCW 34.05.574(1).

IV

Analysis
If a project will involve a discharge into navigable waters, § 401 of the Clean Water Act requires the project proponent to acquire state certification that state water quality standards will not be violated. 33 U.S.C. §§ 1341(a)(1), 1313. The § 401 certification must set forth limitations and monitoring requirements necessary to assure that permit applicants will comply with state law. 33 U.S.C. § 1341(d).
In turn, federal regulations require that a § 401 certification must contain a statement that "there is a reasonable assurance that the activity will be conducted in a manner which will not violate applicable water quality standards." 40 C.F.R. § 121.2(a)(3) (emphasis added).[5] The certification must also contain "[a] statement of any conditions which the certifying agency deems necessary or desirable." 40 C.F.R. § 121.2(a)(4).
Washington has developed its own water quality standards, as permitted by the Clean Water Act. 33 U.S.C. § 1313. The Washington State Legislature enacted the following water quality policy:
to maintain the highest possible standards to insure the purity of all waters of the state consistent with public health and public enjoyment thereof, the propagation and protection of wild life, birds, game, fish and other aquatic life, and the industrial development of the state, and to that end require the use of all known available and reasonable methods by industries and others to prevent and control the pollution of the waters of the state of Washington. Consistent with this policy, the state of Washington will exercise its powers, as fully and as effectively as possible, to retain and secure high quality for all waters of the state.
RCW 90.48.010. Consistent with this overarching policy, Ecology has promulgated specific water quality standards. Ch. 173-201A WAC (surface water); ch. 173-200 WAC (groundwater).[6] Washington's water quality *671 standards consist of narrative criteria protecting the beneficial uses of state waters (see WAC 173-201A-010; former WAC 173-201A-030(1), (2) (1997)), numeric criteria for conventional pollutants and toxic substances (former WAC 173-201A-040(3) (1997); WAC 173-200-040(2)), and an antidegradation policy (RCW 90.54.020(3); former WAC 173-201A-070 (1992)). The antidegradation policy states:
Waters of the state shall be of high quality. Regardless of the quality of the waters of the state, all wastes and other materials and substances proposed for entry into said waters shall be provided with all known, available, and reasonable methods of treatment prior to entry. Notwithstanding that standards of quality established for the waters of the state would not be violated, wastes and other materials and substances shall not be allowed to enter such waters which will reduce the existing quality thereof, except in those situations where it is clear that overriding considerations of the public interest will be served.
RCW 90.54.020(3)(b). Both Ecology and the PCHB have concluded that there is reasonable assurance that the third runway project will not violate these water quality standards. We agree.
A. Deference and the PCHB's Scope of Review
1. Assignment of Deference: There are several fundamental issues on which Ecology and the PCHB disagree. Therefore, it is critical for this court to determine at the outset where to assign deference, particularly with regard to statutory interpretation and technical factual conclusions.
As a preliminary matter it is helpful to recognize the statutory roles assigned to Ecology and the PCHB. Ecology is the agency charged with issuing § 401 certifications for the State. See RCW 90.48.260. In doing so, Ecology must determine whether "there is a reasonable assurance that the activity [at issue] will be conducted in a manner which will not violate applicable water quality standards." 40 C.F.R. § 121.2(a)(3). Ecology approaches "reasonable assurance" as a two-step inquiry. It first determines "through a `preponderance of evidence', that water quality standards can and will be met," identifying "areas of uncertainty." Administrative Record (AR) at 18590. Second, Ecology "[a]ddress[es] the areas of uncertainty by including measures that will remove or reduce the uncertainty." Id. The resulting § 401 certification, if granted, generally includes a list of requirements that Ecology deems necessary to give reasonable assurance that the project at issue will comply with state water quality standards.
Traditionally, executive agencies have been unitary in structure, see Martin v. Occupational Safety & Health Comm'n, 499 U.S. 144, 154, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991); agencies generally perform rule making, interpretive, enforcement, and adjudicatory functions. In 1970, the legislature created the PCHB, a quasijudicial body whose members must be "qualified by experience or training in pertinent matters pertaining to the environment." RCW 43.21B.020. The legislature thus removed certain adjudicatory functions from Ecology and charged the PCHB with providing uniform and independent review of Ecology actions. State ex rel. Martin Marietta Aluminum, Inc. v. Woodward, 84 Wash.2d 329, 333, 525 P.2d 247 (1974); RCW 43.21B.010. Rule making, interpretive, and enforcement functions remain with Ecology, the agency "charged with administration" of water quality statutes and rules. See Dep't of Ecology v. Theodoratus, 135 Wash.2d 582, 589, 957 P.2d 1241 (1998).
The PCHB has jurisdiction over the appeal of § 401 certifications under RCW 43.21B.110(1)(c). When one of Ecology's § 401 certifications is challenged, the PCHB conducts a trial-like adjudicative hearing. The challenger bears the burden of proving to the PCHB, by a preponderance of the evidence, that Ecology's § 401 certification does not provide reasonable assurance that state water quality standards will be met. See WAC 371-08-485(2); PCHB Dec. at 99. The scope and standard of PCHB review is *672 de novo. WAC 371-08-485(1); PCHB Dec. at 93.
The PCHB discusses the burden of proof in this case with regard to the ultimate reasonable assurance determination, but it does not specifically state what the challenger must show to justify the creation of additional conditions. PCHB Dec. at 98-99. Because Ecology is the agency charged with issuing § 401 certifications, see RCW 90.48.260, the PCHB must begin by determining whether Ecology's § 401 certification is adequate. The PCHB cannot add conditions simply because it feels such conditions would make the certification more protective of water quality. The PCHB is to add conditions to a § 401 certification only if the parties challenging the certification have first shown, by a preponderance of the evidence, that Ecology's § 401 certification is inadequate in a particular respect, and additional conditions are needed to reach reasonable assurance. This court reviews that determination according to the standards established by the WAPA, giving appropriate deference to the PCHB's findings of fact. See RCW 34.05.570.
a. Interpretation of Statutes and Regulations: Ecology first argues that this court should give substantial weight to Ecology's interpretation of the statutes it is charged with administering. This court interprets the meaning of statutes de novo; we may substitute our interpretation of the law for that of the agency. Postema v. Pollution Control Hr'gs Bd., 142 Wash.2d 68, 77, 11 P.3d 726 (2000); Theodoratus, 135 Wash.2d at 589, 957 P.2d 1241. However, "[w]here a statute is within [an] agency's special expertise, the agency's interpretation is accorded great weight, provided that the statute is ambiguous." Postema, 142 Wash.2d at 77, 11 P.3d 726; see also Theodoratus, 135 Wash.2d at 589, 957 P.2d 1241. Finally, deference to an agency's interpretation of its own regulations is also appropriate. Postema, 142 Wash.2d at 86, 11 P.3d 726. Because Ecology is the agency designated by the legislature to regulate the State's water resources, RCW 43.21A.020, this court has held that it is Ecology's interpretation of relevant statutes and regulations that is entitled to great weight. See Theodoratus, 135 Wash.2d at 589, 957 P.2d 1241.
The PCHB has acknowledged that Ecology, not the PCHB, is the agency designated by the legislature to be the water pollution control agency with regard to the Clean Water Act. PCHB Dec. at 95; RCW 90.48.260. However, the PCHB argues that this court should defer to the PCHB's interpretation of relevant water quality laws rather than to Ecology's. The PCHB relies on cases in which this court has deferred to the statutory interpretations of other quasijudicial agencies like the growth management hearings boards and the Shoreline Hearings Board, even when those boards disagreed with the city or county that originally issued the relevant permit. Br. of PCHB at 15 (citing Cent. Puget Sound Hr'gs Bd., 142 Wash.2d at 551, 553, 14 P.3d 133 (reviewing the Board's rejection of a county plan); Dep't of Ecology v. Ballard Elks Lodge No. 827, 84 Wash.2d 551, 554-56, 527 P.2d 1121 (1974) (reviewing the Board's adjustment of a city permit)). However, in this case, Ecology, not the PCHB, is the state agency designated by the legislature to be the water pollution control agency with regard to the Clean Water Act. Compare RCW 90.48.260, with Cent. Puget Sound Hr'gs Bd., 142 Wash.2d at 553, 14 P.3d 133 (acknowledging that the growth management hearings boards administer the Growth Management Act, ch. 36.70A RCW). Because the legislature entrusted Ecology with administration of water quality standards, we conclude, in accordance with our prior case law, that we must give great weight to Ecology's interpretation of the laws that it administers. Theodoratus, 135 Wash.2d at 589, 957 P.2d 1241.
b. Technical Judgments: Ecology also argues that it is entitled to deference with regard to its technical judgments, especially when they involve complex scientific issues. The PCHB contends that it conducts a de novo fact-finding hearing "in which the technical expertise of Ecology is put to the test in an adversary proceeding." Br. of PCHB at 12. Therefore, the PCHB asserts that this court should not assign more weight to Ecology's technical judgments than to the PCHB's evaluation of those judgments.
*673 This court reviews a PCHB decision by applying the WAPA standards of review to the PCHB's order and the record created before the PCHB. Pub. Util. Dist. No. 1, 146 Wash.2d at 789-90, 51 P.3d 744. The PCHB's findings of fact are reviewed under the substantial evidence test. RCW 34.05.570(3)(e). This court should overturn a factual finding only if the finding is clearly erroneous. Schuh, 100 Wash.2d at 183, 667 P.2d 64. Therefore, the standard of review for factual findings inherently assigns deference to the PCHB's factual conclusions. This system respects both the PCHB's statutory role as independent reviewer of Ecology actions and the trial-like nature of the PCHB hearings. Woodward, 84 Wash.2d at 333, 525 P.2d 247; WAC 371-08-475, -485.
Even so, in Department of Ecology v. Public Utility District No. 1 of Jefferson County, 121 Wash.2d 179, 849 P.2d 646 (1993), aff'd, 511 U.S. 700, 114 S.Ct. 1900, 128 L.Ed.2d 716 (1994) (hereinafter Elkhorn I,) a § 401 certification case, this court recognized:
[I]t is well settled that due deference must be given to the specialized knowledge and expertise of an administrative agency. E.g., Schuh, 100 Wash.2d at 187, 667 P.2d 64. Here, Ecology was exercising its expertise in judging the appropriate instream flow rate for the Elkhorn project. Therefore, in analyzing the [PCHB's] decision under the clearly erroneous standard, we also give due deference to Ecology's expertise in this area.
Elkhorn I, 121 Wash.2d at 201, 849 P.2d 646. Therefore, this court begins by applying the clearly erroneous standard to PCHB's factual determinations. Within the framework of determining whether one of the PCHB's factual findings is clearly erroneous, this court gives due deference to Ecology's expertise.
In sum, with regard to each challenge to a § 401 certification, the PCHB must determine as a threshold matter whether the § 401 certification provides reasonable assurance that state water quality standards will be met. The PCHB may create an additional condition only after it has concluded that the § 401 certification is inadequate to protect water quality in a particular respect. In addition, Ecology's interpretations of water quality statutes are entitled to great weight, so long as they do not conflict with the statute's plain language. Ecology's interpretations of its own regulations are also entitled to great weight. While a PCHB factual finding will not be overturned unless it is clearly erroneous, deference will be given to Ecology on technical issues based on Ecology's specialized expertise.
2. Scope of Review: We use the term "scope of review" in this case as the PCHB has used the term, namely to refer to the scope of evidence that the PCHB can consider when reviewing an Ecology § 401 certification.[7] The PCHB had to determine whether it should review Ecology's § 401 certification based only upon the record available at the time Ecology issued the certification or whether it could consider all information available at the time of the hearing, including postcertification plans, reports, and studies.
The WAPA requires the PCHB to provide all parties the opportunity to present evidence "[t]o the extent necessary for full disclosure of all relevant facts and issues ... except as restricted ... by the prehearing order." RCW 34.05.449(2). The WAPA also states that "[e]vidence ... is admissible if in the judgment of the presiding officer it is the kind of evidence on which reasonably prudent persons are accustomed to rely in the conduct of their affairs." RCW 34.05.452(1). Title 371 WAC, which specifically governs PCHB procedures, states that "[h]earings shall be formal and quasi-judicial in nature. The scope and standard of review shall be de novo unless otherwise provided by law." *674 WAC 371-08-485(1) (2002) (see clarifying amendment Wash. St. Reg. XX-XX-XXX (Mar. 20, 2002)).[8]
In its decision, the PCHB recognized that its scope of review is generally de novo. PCHB Dec. at 93. However, the PCHB concluded that the Clean Water Act and applicable state and federal regulations require PCHB review of a § 401 certification to be based on, but not exclusively limited to, the record that was before Ecology at the time the § 401 certification was issued. Id. at 94-96. According to the PCHB, "[t]o hold otherwise would blur the distinction between Ecology and the Board's statutory roles, ignore the requirements of the Clean Water Act, and foster issuance of speculative and incomplete permits." Id. at 94.
a. Postcertification Plans, Reports, and Studies: The PCHB held that it could rely on postcertification plans, reports, and studies completed pursuant to Ecology's § 401 certification conditions, so long as their implementation, expected outcomes, and contingency plans were set forth in the § 401 certification in sufficient detail so as to support reasonable assurance. Id. at 94-95. The PCHB also stated that it would accept such "explanations of [the information relied upon by Ecology] as may be offered as evidence to this Board," because they speak to the propriety of Ecology's reasonable assurance determination. Id. at 96.
CASE argues that the PCHB erroneously interpreted or applied the law when it considered plans, reports, and studies created after the § 401 certification. According to CASE, Ecology's certification must be based on reasonable assurance that there was compliance with water quality laws at the time of Ecology's certification, and the PCHB should be strictly limited to review of the record available to Ecology at the time the certification was issued. However, the WAPA clearly prefers "full disclosure of all relevant facts and issues." RCW 34.05.449(2). Moreover, the Clean Water Act regulations contemplate that § 401 certifications will be supplemented by future plans, reports, and studies. See 40 C.F.R. § 121.2(a)(4) (allowing states to attach conditions to § 401 certifications).
In addition, reflection on the statutory role of the PCHB clearly indicates that a de novo scope of review is appropriate. This court has recognized that the PCHB, not Ecology, was appointed by the legislature to adjudicate proceedings arising out of Ecology actions. Postema, 142 Wash.2d at 121, 11 P.3d 726. PCHB adjudicative proceedings are trial-like in nature. They involve prehearing briefing, opening statements, presentation of evidence, examination of witnesses, and rulings on the admissibility of evidence. See WAC 371-08-475. Nothing suggests that review should be limited to the record below. In fact, this court has interpreted WAC 371-08-485 to allow "Ecology and all other parties to present all relevant information for the Board to make a decision." Postema, 142 Wash.2d at 121, 11 P.3d 726. Therefore, the PCHB did not erroneously interpret or apply the law or act contrary to agency rule when it considered reports and studies that were not available to Ecology.
b. Restricted Scope of Review: Ecology and the Port argue that the PCHB's articulated scope of review is too restrictive; they contend that the PCHB erroneously interpreted or applied the law and acted arbitrarily and capriciously when it limited the scope of review. But neither the Port nor Ecology complains that any piece of evidence was improperly excluded based on the purportedly limited scope of review.
In its briefing to this court, the PCHB argues that its order applied the de novo scope of review with regard to the water quality issues addressed in the § 401 certification. However, if a new water quality issue arose, one that Ecology did not address in its § 401 certification, then the Port and Ecology could not use "the period of time during which the PCHB hearing is pending to address new issues that were not considered or addressed prior to the Certification." *675 PCHB Br. at 5-6. This would leave § 401 certifications as "moving targets," making review unmanageable. PCHB Dec. at 117. The PCHB contends that whether proffered evidence relates to the issues addressed in the § 401 certification or whether it involves a new issue would be a question to be determined by the PCHB on a case by case basis.
However, the PCHB has historically applied a pure de novo scope of review, deciding cases based on all evidence available at the time of the PCHB hearing. Id. at 93 (citing Barrish & Sorrenson Hydroelectric v. Dep't of Ecology, PCHB No. 94-193, Conclusion 4 (1995) (holding the Board decides de novo whether a proposed project complies with Washington water quality standards "based on the proposed project as it is presented to the Board at [the] hearing.")). The PCHB explained its deviation from prior practice in this case by stating that the relevant project in Barrish was "far smaller in scope and complexity" than the third runway project. Id. Yet, we conclude that a variable scope of review based on the size of the project would be both arbitrary and unworkable.
Moreover, nothing in the Clean Water Act or Environmental Protection Agency (EPA) regulations justifies limitation of the de novo scope of review in the face of the WAPA provisions and PCHB regulations that call for de novo review. See RCW 34.05.449(2); WAC 371-08-485(1). The PCHB must perform an independent review, Woodward, 84 Wash.2d at 333, 525 P.2d 247, determining for itself whether there is reasonable assurance that water quality standards will be met. Although the PCHB raised the problem of the "moving target," it is not clear that this is a problem in practice, especially given the PCHB's ability to set a firm discovery deadline. In addition, allowing a challenger to raise a novel issue, but then prohibiting Ecology from presenting evidence to rebut the novel claim, is contrary to the WAPA and the PCHB's own rules. If a novel issue, not addressed by the § 401 certification, establishes that there is no reasonable assurance that water quality standards will be met, the PCHB can overturn the § 401 certification, remanding to Ecology for further consideration. Therefore, a truly de novo scope of review, subject to discovery deadlines, is appropriate, and departure from the PCHB's rule is not justified.[9] Because the Port and Ecology point to no evidence that was excluded based on the purportedly limited scope of review in this case, no further action is needed here.
B. Reasonable Assurance in Light of Conditions, Future Submissions, Monitoring, and Adaptive Management
A § 401 certification must contain a statement that "there is a reasonable assurance that the activity [at issue] will be conducted in a manner which will not violate applicable water quality standards." 40 C.F.R. § 121.2(a)(3). ACC and CASE argue that Ecology and the PCHB erred in concluding there was reasonable assurance that state water quality standards would not be violated by the third runway project. Because Ecology and the PCHB ultimately agreed on this question, we are loath to override the judgment of both agencies, whose combined expertise merits substantial deference.
ACC and CASE object to the uncertainty inherent in certification conditions, future submissions, future NPDES permits, and adaptive management. We must first consider the meaning of "reasonable assurance." Ecology approaches "reasonable assurance" as a two-step inquiry. It first determines "through a `preponderance of evidence', that water quality standards can and will be met," identifying "areas of uncertainty." AR at 18590. Second, Ecology "[a]ddress[es] the areas of uncertainty by including measures that will remove or reduce the uncertainty." Id. Because Ecology is the agency charged with *676 issuing § 401 certifications, its interpretation of the law it routinely administers deserves deference.[10]
The PCHB has stated that "`"reasonable assurance" means something is reasonably certain to occur. Something more than a probability; mere speculation is not sufficient.'" PCHB Dec. at 99 (quoting Airport Cmtys. Coalition v. Dep't of Ecology, PCHB No. 01-160, Order Granting Motion to Stay). Clearly, the "reasonable assurance" standard does not require absolute certainty. The inherent predictive nature of a § 401 certification cannot be avoided; each § 401 certification must address future events and the likelihood that those events will result in violations of water quality standards.
1. Conditions: The PCHB determined that it had the authority to impose 16 new conditions on the § 401 certification. PCHB Dec. at 94. Without these conditions, the PCHB concluded that reasonable assurance would not be met. Id. CASE argues the PCHB should have remanded to Ecology for a new evaluation of reasonable assurance, rather than "repairing" the § 401 certification with new conditions.
40 C.F.R. § 121.2 allows the state certifying agency to include in the certification a statement of "any conditions which the certifying agency deems necessary or desirable with respect to the discharge of the activity." 40 C.F.R. § 121.2(a)(4). Therefore, the placement of conditions on a § 401 certification is authorized by law., Given the PCHB's statutory role requiring it to provide uniform and independent review of Ecology's actions, it is well within the PCHB's authority to add conditions in order to bring a § 401 certification into the realm of reasonable assurance. See, supra, part IV.A.1. (discussing the relationship and comparative powers of the PCHB and Ecology).
2. Future Submissions: Ecology required submission of revised studies, plans, and reports as a condition for § 401 certification, relying on future submissions to support its finding of reasonable assurance. PCHB Dec. at 20. ACC argues that reasonable assurance could not possibly exist before acceptance of the revised studies, plans, and reports. ACC and CASE presumably claim that the PCHB erroneously applied the reasonable assurance standard or acted arbitrarily and capriciously when it found there could be reasonable assurance before the revisions were submitted.
ACC points to the PCHB's ruling in Okanogan Highlands Alliance v. Dep't of Ecology, PCHB 97-146, 2000 WL 46743 (Jan. 20, 2000), in which the PCHB found significant uncertainties about the impact of the project and concluded a § 401 certification was not appropriate, given the lack of key information in that case. Id. at *20. Yet, the need for additional studies, plans, and reports does not, by itself, call into question a finding of reasonable assurance. "[T]he Board may rely on the conditions, which require completion of post-certification studies, plans, and reports so long as the implementation and outcome of those post-certification studies, plans, and reports meet the same reasonable assurance test." PCHB Dec. at 94-95. The requirements for such future submissions must be set out in detail in the certification. Id. at 95. This compromise is reasonable because it appropriately balances the agencies' need for specific additional information against the one-year time constraint placed on state certification. See 33 U.S.C. § 1341(a)(1); Graves, 280 F.Supp.2d at 1217.
Unlike Okanogan Highlands, the requirements for further information in this § 401 certification are specific enough to be set out in detail, such that Ecology and the PCHB were not unreasonable when they concluded that there was reasonable assurance that water quality standards would be met. See, e.g., AR at 7443-44 (requiring monitoring plan for instream construction); AR at 7476-80 (detailing necessary revisions to the Natural Resources Mitigation Plan). Moreover, it is probable in these circumstances that the required materials will in fact be submitted. Ecology retains some enforcement authority, which it can implement if the Port fails to submit the required materials or if submissions *677 are inadequate. The Port may not proceed with construction without written approval of the new materials from Ecology. In addition, Ecology issued the certification as an order, the violation of which results in penalties described in the order itself. Finally, failure to submit documents can result in revocation of the order/certification.
Therefore, Ecology and the PCHB can rely on future submissions of revised plans, reports, and studies, so long as their implementation and anticipated outcome meet the reasonable assurance test. Ecology and the PCHB were not arbitrary or capricious when they found reasonable assurance that revisions to the Port's studies, plans, and reports would resolve uncertainties, and the PCHB did not erroneously apply the reasonable assurance standard. See 40 C.F.R. § 121.2(a)(4).
3. NPDES Compliance: NPDES permits are governed by § 402 of the Clean Water Act. 33 U.S.C. § 1342. Washington has chosen to implement its own NPDES program as allowed by federal law. 33 U.S.C. § 1342(b); ch. 173-220 WAC. The NPDES permitting system regulates discharges, including stormwater discharges, into waters of the United States. See 33 U.S.C. § 1342(p). NPDES permits are updated and reissued regularly.[11] The PCHB concluded that Ecology was reasonable in relying on the Port's NPDES permit and future revisions for reasonable assurance. PCHB Dec. at 100. ACC now argues that allowing future NPDES stormwater requirements to supersede current § 401 certification requirements could create a loophole through which the Port may avoid compliance with state water quality standards.
NPDES permits may be issued only where the discharge in question will comply with state water quality standards. 33 U.S.C. § 1342(b)(1)(A) requires state-issued NPDES permits to comply with 33 U.S.C. § 1311. In turn, 33 U.S.C. § 1311(b)(1)(C) requires effluent limitations to comply with state water quality standards. In addition, 40 C.F.R. § 122.44 requires state-issued NPDES permits to contain conditions requiring compliance with state water quality standards. 40 C.F.R. § 122.44(d)(1); see also 40 C.F.R. § 123.25(a)(15). Therefore, the NPDES permitting system and the § 401 certification share a purpose; both must ensure compliance with state water quality standards. See WAC 173-220-130 (NPDES standards) and former WAC 173-201A-160 (1997) (Surface Water Quality Standards-Implementation). Where both a § 401 certification and a NPDES permit are necessary, Ecology will apply the two in a nonduplicative and complementary manner. PCHB Dec. at 108.[12] Adherence to such a policy is reasonable given the matching goals of the two permitting programs.
The PCHB concluded that Ecology is entitled to rely on future NPDES permits to provide reasonable assurance that the third runway project will continue to comply with water quality standards in the future. PCHB Dec. at 110. ACC and CASE contend that the legal requirement that the NPDES permits comply with water quality standards is not enough to provide reasonable assurance. First, they argue that NPDES permits only require compliance with best management practices, making them less protective of water quality than § 401 certifications. However, the PCHB expressly stated that if a § 401 certification condition is not incorporated into a new NPDES permit, that condition shall remain in effect as provided in the § 401 certification. *678 PCHB Dec. at 17. Such conditions are enforceable so long as the § 401 certification remains in effect. RCW 90.48.144(3).
Moreover, ACC and CASE offer no credible argument to support a conclusion that future NPDES permits will fail to meet water quality standards. NPDES permits are subject to an "anti-backsliding" provision, which does not allow a subsequent NPDES permit to create a lesser effluent limitation, 33 U.S.C. § 1342(o), and all NPDES permits are subject to PCHB and judicial review. Therefore, sufficient protections exist for this court to be reasonably certain that future NPDES permits will comply with water quality standards.
Both the PCHB and Ecology have interpreted the relevant statutory and regulatory schemes to allow reliance on future NPDES permits for reasonable assurance. Because Ecology is the agency entrusted with administering both the § 401 certification program and the NPDES permit program, its interpretation of relevant statutes and regulations is entitled to great deference. NPDES permits must comply with state water quality standards, so ACC's suggested loophole does not seem to exist. Ecology and the PCHB did not err when they relied on compliance with current and future NPDES permits for reasonable assurance.[13]
4. Monitoring and Adaptive Management: Ecology's § 401 certification requires ongoing monitoring of various aspects of the project including wetland mitigation (for 15 years), surface and groundwater contamination (for 8 years), and fill criteria and low flow mitigation (in perpetuity). PCHB Dec. at 86. Where the required monitoring reveals that water quality standards are being violated, contingency plans shall be implemented to bring the project back into compliance. Id. at 86-87, 137-138 (adding conditions 12-13, which require actions to eliminate future exceedances). Monitoring and the implementation of contingency plans are referred to as "adaptive management." Id. at 87.
The PCHB concluded that the § 401 certification may rely on adaptive management for reasonable assurance, so long as requirements are set forth with specificity, and the future corrective action and outcome are reasonably certain to occur. Id. at 86, 101, 131. Specific enforceable requirements must be contained in the § 401 certification for implementation in the event that monitoring reveals that water quality standards are not being met. Id. at 86. The PCHB did warn that adaptive management shall not be used to defer or delay implementation of state water quality standards. Id. at 87, 131.
ACC and CASE argue that reliance on future monitoring and adaptive management is fundamentally at odds with the reasonable assurance requirement. Presumably they argue that reliance on adaptive management is arbitrary and capricious or an erroneous application of the reasonable assurance standard. However, 33 U.S.C. § 1341(d) specifically allows for future monitoring necessary to assure compliance with applicable water quality standards:
Any certification provided under this section shall set forth any ... monitoring requirements necessary to assure that any applicant for a Federal license or permit will comply with any applicable ... limitations... and with any other appropriate requirement of State law set forth in such certification.
(Emphasis added.) Moreover, the Washington Court of Appeals and the Ninth Circuit have both approved the practice of monitoring and adaptive management. W. 514, Inc. v. County of Spokane, 53 Wash.App. 838, 844, 770 P.2d 1065 (1989); Friends of the Payette v. Horseshoe Bend Hydroelectric, Co., 988 F.2d 989, 993 (9th Cir.1993) (reliance on monitoring and supplemental mitigation was not arbitrary and capricious). Ecology *679 and the PCHB did not erroneously interpret or apply the law when they required monitoring and adaptive management.
Both the law and the record in this case firmly support a conclusion that monitoring and adaptive management are fundamental elements of reasonable assurance. Because a finding of "reasonable assurance" is predictive in nature, Ecology could not be absolutely certain when it issued the § 401 certification that the project as currently planned would comply with water quality standards. Monitoring and adaptive management provide a mechanism through which Ecology can mitigate that inherent uncertainty. Significantly, if Ecology perceives that adaptive management is being used to delay compliance with water quality standards, it can and must invoke the enforcement mechanisms contained within the certification. The PCHB has recognized this risk and has accounted for it in its order. Therefore, Ecology and the PCHB did not err when they relied on adaptive management for reasonable assurance. In sum, Ecology and the PCHB properly found there is reasonable assurance that the third runway project will meet state water quality standards.
C. Low Flow Mitigation
The construction of the third runway will result in an additional 305 acres of impervious surfaces, which will significantly increase stormwater runoff. PCHB Dec. at 17. Increased runoff will increase peak flows during or just after rainstorms. It will also change groundwater infiltration patterns, causing flows to be lower in dry months. Des Moines, Miller, and Walker Creeks are all classified as class AA streams; they receive the highest protection available in Washington. Because these streams already flow at very low levels during summer months, removal of even small quantities of water will pose significant hazards to aquatic health. To obtain a § 401 certification, the Port had to demonstrate that legal and practical means would be implemented to permanently mitigate low flow impacts. Id. at 119 (citing Elkhorn I, 121 Wash.2d at 185-92, 849 P.2d 646). "[T]he purpose of mitigation for low flow impacts is to mimic pre-development conditions." Id. at 46.
In order to identify the low flow impact of the third runway project, the Port conducted a modeling analysis. The modeling identified the baseline, preconstruction low flows of Des Moines Creek based on 1994 conditions. It then predicted the low flow impact of the increased impervious surfaces that will result from the third runway project. The Port calculated its mitigation requirements to be 0.11 cfs[14] for Walker Creek, 0.08 cfs for Des Moines Creek, and 0.00 cfs for Miller Creek, based on anticipated impact of the third runway project. Id. at 46.[15] The PCHB also explained that "the Port selected the threshold flows below which mitigation would be required (0.33 cfs for Des Moines Creek, 0.77 cfs for Walker Creek, and 0.73 cfs for Miller Creek)." Id. at 45.
The PCHB found that the Port's modeling produced data that was accurate within a reasonable margin of error. Although ACC and CASE challenged the modeling conclusions at the hearing, the PCHB found that they did not meet their burden of showing the modeling assumptions were unreasonable or would lead to violation of water quality standards. The PCHB found that models may be properly calibrated without exactly replicating measured data. In addition, the PCHB recognized that safeguards exist because the Port must monitor actual flows and implement contingency measures accordingly.
Even so, the PCHB found that a preliminary design showed that the minimum low flow in Des Moines Creek should be 1.0 cfs rather than 0.33 cfs. Therefore, the PCHB found "the correct threshold flow to be 1[.0] CFS, below which mitigation will be required." Id. at 45. The PCHB then added condition 6 to the § 401 certification to include this requirement, which ultimately increased *680 the amount of water the Port would be required to discharge into Des Moines Creek. Id. at 136.
The Port proposed to mitigate low flows by detaining stormwater in vaults during winter months and then discharging the detained water into the affected creeks during low flow periods. The PCHB recognized that stormwater management often involves detention and later release of water into the ground or into the stream. The PCHB ultimately concluded that the Port's low flow plan provided reasonable assurance that water quality standards would be met.
1. Adequacy of Plan: ACC contends that Ecology and the PCHB erred in their ultimate conclusion that there is reasonable assurance that the low flow mitigation plan will meet water quality standards. The Port plans to capture stormwater, detain it during the winter months, and slowly release it into the streams to mitigate summer low flows. ACC argues that this is a novel approach to low flow mitigation, an assertion that is contested by the Port. However, even if the Port's plan constitutes a novel approach, that fact in and of itself is not enough to preclude reasonable assurance. Where, as here, both Ecology's experts and the PCHB are satisfied that the plan will work, there is nothing inherently wrong with adopting a novel approach to the problem of low flow mitigation.[16]
ACC also argues that the low flow conditions in the § 401 certification do not require that mitigation commence before impacts from construction begin.[17] However, it is not clear from the record cited by ACC that low flow impacts will occur before construction of the stormwater vaults is complete. In fact, the stormwater management plan includes a plan for managing stormwater over the course of construction. Finally, the extent of any early low flow impact on water quality is unclear. Thus, ACC has not pointed to enough evidence in the record to establish that both Ecology and the PCHB acted unreasonably when they failed to require low flow augmentation before completion of the storage vaults. In sum, the PCHB did not err in concluding that the Port's low flow mitigation plan was both feasible and adequate.[18]
2. 1.0 cfs Requirement: The Port used the models discussed above to predict the impact of the third runway project on low flows and concluded that the project would reduce low flows in Des Moines Creek by 0.08 cfs. PCHB Dec. at 45-46. Ecology approved the Port's low flow impact offset facility proposal, which "involves the release of 13.5 acre-feet of water to Des Moines Creek at the rate of 0.08 cfs, continuously between July 24 and October 24 each year." PCHB Dec. at 51-52.
In contrast, the PCHB concluded that the modeling established threshold flows below which mitigation would also be required, 0.33 cfs for Des Moines Creek. Because the PCHB found that a Des Moines Creek augmentation *681 preliminary design was based on data that showed that the threshold low flow at the monitoring station was 1.0 cfs, the PCHB set the threshold mitigation level at 1.0 cfs for Des Moines Creek, adding it as condition 6. The Port argues that the PCHB erred when it required the Port to mitigate low flows in Des Moines Creek anytime flows fall below 1.0 cfs because this condition requires it to augment low flows beyond the 0.08 cfs impact of the third runway project.
ACC and CASE argue that substantial evidence supports the PCHB's conclusion that the Port should be required to maintain Des Moines Creek flows at 1.0 cfs, regardless of the actual impact of the third runway project. The Port, in conjunction with its 1998 application for a § 401 permit, proposed to maintain 1.0 cfs flow in Des Moines Creek. Apparently, this proposal was abandoned after it was discovered that the Port could not obtain a water right to pump well water to support this plan. ACC and CASE argue that the abandoned proposal provides substantial evidence to support the PCHB's requirement, and such a requirement is not arbitrary and capricious. Yet, notably, ACC and CASE do not point to any evidence in the record that the actual impact of the third runway project will be more than 0.08 cfs, as predicted by the Port's models.[19]
Although the PCHB's factual findings must be upheld absent clear error, this question turns on whether water quality standards require the Port to maintain a particular low flow in Des Moines Creek or whether the water quality standards require the Port to merely offset the impacts of its third runway project. An agency's application of the law to a particular set of facts is subject to de novo review. Tapper, 122 Wash.2d at 403, 858 P.2d 494 (citing Henson v. Employment Sec. Dep't, 113 Wash.2d 374, 377, 779 P.2d 715 (1989) ("With mixed questions of law and fact, the court determines the correct law independent of the agency's decision and then applies it to the facts as found by the agency.") and Johnson v. Dep't of Employment Sec., 112 Wash.2d 172, 175, 769 P.2d 305 (1989) ("Because the resolution of mixed law and fact issues does not require `reweighing evidence of credibility and demeanor', this court reviews them under a de novo standard." (quoting Sellers, 97 Wash.2d at 330, 646 P.2d 113))). The applicable antidegradation policy states:
Existing beneficial uses shall be maintained and protected and no further degradation which would interfere with or become injurious to existing beneficial uses shall be allowed.
Former WAC 173-201A-070(1) (emphasis added). The antidegradation policy contemplates offset of the impact of the project at issue, rather than restoration to pristine conditions. Ecology's approval of the low flow offset proposal is consistent with this interpretation of its antidegradation policy. While it may be that the PCHB intended to offset both the third runway project and earlier urban impacts on Des Moines Creek, neither the PCHB nor ACC and CASE point to evidence that the Port caused prior degradation of Des Moines Creek. Finally, if monitoring reveals that the third runway reduces summer flows in Des Moines Creek by more than 0.08 cfs, Ecology can require additional mitigation, something that the PCHB found to be feasible. Therefore, the PCHB erroneously interpreted and applied the law when it required that the Port do more than offset the impact of the third runway, and PCHB condition 6 is overturned.
3. Water Right: The Port's low flow offset plan requires it to capture and detain stormwater and then slowly release it into Walker and Des Moines Creeks during dry months. Ecology did not require the Port to obtain a water right to carry out its low flow offset plan because it considered the plan to involve stormwater management. However, the PCHB determined that capture and detention of stormwater, followed by its release for the purposes of augmenting low instream flows, amounted to a "beneficial use" of state water, requiring a water right and adding the requirement as condition 16. The Port now argues that the PCHB erroneously interpreted the water code, chapter 90.03 RCW, to mean that detention and release *682 of stormwater amounts to "use" rather than "stormwater management." See PCHB Dec. at 121 (recognizing distinction between stormwater management and beneficial use).[20]
This court interprets statutes de novo. Public Util. Dist. No. 1, 146 Wash.2d at 790, 51 P.3d 744. Yet because Ecology is the agency charged with interpreting and applying the water code, its interpretation of a provision deserves deference, so long as that interpretation is not contrary to the plain language of the statute. Id.; Theodoratus, 135 Wash.2d at 589, 957 P.2d 1241. Washington's water code states:
Subject to existing rights all waters within the state belong to the public, and any right thereto, or to the use thereof, shall be hereafter acquired only by appropriation for a beneficial use and in the manner provided and not otherwise; and, as between appropriations, the first in time shall be the first in right.
RCW 90.03.010.[21]
Any person ... hereafter desiring to appropriate water for a beneficial use shall make an application to the department for a permit to make such appropriation, and shall not use or divert such waters until he has received a permit.
RCW 90.03.250. Stormwater is water of the state, and the legislature has declared uses of water for "fish and wildlife maintenance and enhancement, ... and preservation of environmental and aesthetic values," to be beneficial. RCW 90.54.020(1). Even so, if the Port's plan amounts to management, rather than "use" of stormwater, then the water right requirement, by definition, would not apply.[22]See PCHB Dec. at 121.
In addition, RCW 90.03.370[23] requires a secondary reservoir permit for capture and use of large volumes of water. Under that section, a "party or parties proposing to apply to a beneficial use the water stored in any such reservoir shall also file an application for a permit, to be known as the secondary permit, which shall be in compliance with the provisions of RCW 90.03.250 through 90.03.320." RCW 90.03.370 (emphasis added). The section applies to "`underground artificial storage and recovery project[s],'" which include "any project in which it is intended to artificially store water in the ground through injection, surface spreading and infiltration, or other department-approved method, and to make subsequent use of the stored water." RCW 90.03.370(3) (emphasis added); see AR at 55459 (Ecology supervisor acknowledging that a permit is required for impoundment of water to be put to beneficial use). Notably, application of this section also depends first upon whether the Port's detention and later release of the stormwater amounts to "use" rather than "management."
Thus, the essential question is whether the Port's plan will amount to "use" rather than "management" of stormwater. The water code does not define "use." While the Water Resources Act of 1971, chapter 90.54 RCW, defines "utilize" to include "the retention of water in lakes and streams for the protection of environmental, scenic, aesthetic and related purposes," RCW 90.54.120(2), that definition has not been applied to the term "use" under the water code. However, Ecology has promulgated definitions of consumptive and nonconsumptive uses. A consumptive use is "use of water whereby there is a diminishment of the water source." WAC 173-500-050(5). A nonconsumptive use is "a type of water use where either there is no *683 diversion from a source body, or where there is no diminishment of the source." WAC 173-500-050(9). Thus, Ecology's definitions seem to contemplate that an action can be a "use," even if it does not involve consumption or diversion of water from a source body.
However, Ecology has also approved multiple existing stormwater management plans that retain stormwater and slowly release it into the ground to avoid peak flows (infiltration plans). Ecology does not require such a system to obtain a water right. There is no justification for distinguishing between stormwater infiltration to avoid peak flows and stormwater management to mitigate low flows. Therefore, if this court requires a water right in this case, we would also have to require a water right for stormwater infiltration.
Instead, we recognize that water may be managed without being "used" or "appropriated." The Port's detention of stormwater and the subsequent release into streams does not amount to a "use" because the action is intended only to mimic preproject flows. Practically, the Port's plan does nothing but adjust the timing at which the stormwater joins the stream. It does not subtract water from the streamflow, nor does it divert water from the stream or involve the withdrawal of groundwater. Therefore, the Port's plan to detain and release stormwater is "stormwater management" and a water right is not required. Although the Center for Environmental Law and Policy (CELP) argues that the Port will "use" the stored water to fulfill its duty to mitigate low flows, we agree with Ecology that the term "use" requires a change in existing hydrology before the requirement of a water right is triggered. The mere mimicking of preconstruction flows is not enough.
ACC, CASE, and CELP refer to various situations in which a water right is required, but all are distinguishable. First, although the PCHB in Okanogan Highlands, PCHB No. 97-146, required a water right for a mitigation plan, the mining project at issue there involved consumptive use of water, id. at ** 10-13, and the mitigation plan involved diversion from area creeks, rather than capture of stormwater. Id. at ** 5-6. Second, the fact that a water right is required to use stormwater for irrigation is irrelevant because irrigation is clearly a consumptive use. WAC 173-500-050(5). Third, at the hearing ACC and CASE referred to several instances in which Ecology required water right applicants to mitigate their consumption of water by returning water to the source stream. However, these situations involved an underlying consumption of water. Finally, it is important to note that the Port's plan mimics preproject flows by detaining stormwater before it enters the stream; the plan does not involve diversion of water from the stream, alteration of stream hydrology, or withdrawal of groundwater. Therefore, none of these existing water right principles requires a water right for low flow offset whose source is stormwater. In fact, mere storage or drainage of water has not traditionally been considered a "use." See Fort Lyon Canal Co. v. Amity Mut. Irrig. Co., 688 P.2d 1110, 1113 (Colo.1984); CLESSON S. KINNEY, A TREATISE ON THE LAW OF IRRIGATION AND WATER RIGHTS 1206-07 (2d ed.1912).
ACC and CASE also contend that classification of the Port's system as management, rather than use, would create a loophole in the water right system, allowing stormwater managers to use their captured stormwater indiscriminately. However, our definition of stormwater management, which includes only systems that maintain the existing hydrology of a stream, is narrow enough to avoid such a result.
To justify its water right condition, the PCHB also states that a water right is needed to ensure that future appropriators will not interfere with the Port's water source. If the Port indeed obtains a water right for this project, it will be protected from future interference by later appropriators. See Neubert v. Yakima-Tieton Irrig. Dist., 117 Wash.2d 232, 237, 814 P.2d 199 (1991).[24] However, Ecology found that reasonable assurance *684 existed, even without a water right, because it recognized that there was no reasonable probability that a future appropriator would be physically able to capture stormwater from the third runway.[25] Such a conclusion is reasonable, given that the Port will collect stormwater runoff only from its own property.[26] Therefore, we conclude that ACC and CASE did not demonstrate, by a preponderance of the evidence, that a water right was necessary for reasonable assurance.
In sum, we conclude that the Port's low flow offset plan involves management of stormwater, rather than its use, because the Port will do nothing more than maintain existing stream hydrology. Because the circumstances of this case are unique, no legal loophole results. While there is minimal risk that, in the absence of a water right, the Port's access to its stormwater may someday be threatened, that risk is properly accounted for in the "reasonable assurance" determination. Therefore, the PCHB erroneously interpreted and applied Washington law when it required the Port to obtain a water right as a prerequisite to capturing and detaining stormwater for summer release into the streams, and PCHB condition 16 is overturned.
D. Fill
To build the third runway, the Port must construct an embankment on top of existing drainage basins, requiring approximately 20 million cubic yards of fill. There is a risk that runoff from the embankment could transport any fill contaminants to area wetlands and streams. Groundwater percolating through the embankment could also transport contaminants.
Washington's toxic substances water quality standard states:
Toxic substances shall not be introduced above natural background levels in waters of the state which have the potential either singularly or cumulatively to adversely affect characteristic water uses, cause acute or chronic toxicity to the most sensitive biota dependent upon those waters, or adversely affect public health, as determined by the department.
WAC 173-201A-240(1); see also former WAC 173-201A-040(1); former WAC 173-201A-030(1)(c)(vii). In addition, the applicable antidegradation standard states that "[e]xisting beneficial uses shall be maintained and protected and no further degradation which would interfere with or become injurious to existing beneficial uses shall be allowed." Former WAC 173-201A-070(1). Ecology was faced with establishing criteria to screen fill material so that these water quality standards would be met.
In its August § 401 certification, Ecology imposed numeric fill criteria for a list of naturally occurring hazardous substances and total petroleum hydrocarbons (gasoline, diesel, and heavy oils) (hereinafter TPH). In the meantime, the United States Fish and Wildlife Service (FWS) created a biological opinion, in which it also set fill criteria for eight of the hazardous substances. The FWS required a 40-foot thick wedge of ultraclean dirt, called the drainage layer cover, to be placed directly over a drainage layer at the bottom of the embankment. For the drainage layer cover, the FWS calculated acceptable soil concentrations that would protect water quality. Finally, the FWS allowed the Port to use fill exceeding its standards for the drainage layer cover only if the SPLP demonstrated that alternative criteria would be protective.
*685 Because there were discrepancies between the FWS criteria and the August § 401 criteria, the September § 401 certification adopted the more stringent of the two criteria for each substance and adopted the requirement that the Port add an ultraclean drainage layer cover. The September § 401 certification also adopted the FWS's approval of the SPLP procedure. ACC and CASE complain that the September § 401 certification's changes in the fill criteria were inadequate and adopted without consultation with Ecology experts.
1. Numeric Fill Criteria: To prevent contamination from fill, the § 401 certification establishes fill criteria for hazardous substances. The § 401 certification first limits possible sources of fill dirt to state-certified borrow pits, contractor-certified construction sites, and Port-owned properties. When a piece of land within those categories is identified as a potential fill source, it must first be subjected to a historical analysis to determine past uses of the land (Phase I). If potential exists for contamination, Phase II screening occurs, involving interviews regarding site history, site visits, and sampling. If the proposed borrow site was ever contaminated, even if it has since been rehabilitated, its dirt may not be used as fill for the third runway. AR at 2894-95 (allowing only naturally occurring, uncontaminated soils). Even after this historical screening, each fill source must be analyzed for 14 naturally occurring hazardous substances and TPHs. Id. at 7456-58, 7486.[27] The § 401 certification creates one set of more stringent numeric fill criteria for the 40-foot drainage layer cover and another set of numeric fill criteria for the rest of the embankment. PCHB Dec. at 58.
There are no current state or federal rules or guidelines setting numeric contaminant limitations for soil that will be used to fill streams or wetlands. Therefore, Ecology looked to the Model Toxics Control Act (MTCA), Method A soil cleanup levels for unrestricted use. WAC 173-340-900, Table 740-1. Where no Method A limit was available, Ecology determined numeric criteria by back-calculating, starting with the numeric criteria for receiving water and working backward to derive soil concentrations that would be protective of water quality. PCHB Dec. at 59. Ecology compared the resulting soil concentration limits with natural background soil concentrations (set at a level that is higher than 90 percent of the natural background samples taken). Id. at 59-60. Ecology also compared the soil concentration limits with practical quantitation limits (PQLs), which are the lowest concentration of a contaminant that can reliably be measured in a lab. Id. at 60 n. 1. If either the background level or the PQL level was higher than the back calculation, then Ecology adjusted the level upward to the higher of those levels. Id.
The Port conducted a study in which it modeled the water contamination that would result if the Port used fill that contained the maximum amount of each substance in the embankment allowed by the § 401 certification. Even where the Port's expert entered fill into the model that contained maximum amounts of each contaminant, the model showed that surface water criteria would not be exceeded. This was true even when arsenic, the most mobile of the contaminants, was increased to 10 times the § 401 certification limit.
The PCHB found that many of the numeric criteria in the § 401 certification were set at levels that were higher than natural background levels. In addition, the PCHB found that Ecology mistakenly calculated PQLs for some of the contaminants listed. Therefore, the PCHB found that fill criteria should be set first at background soil levels, where available. Otherwise, the PCHB found that Ecology should conduct back calculations based on surface and groundwater criteria. Only when neither of those methods is available, should MTCA Method A standards be used. According to this system, the PCHB set new numeric fill criteria and added those requirements as condition 7. Finally, although the Port argued that some naturally occurring TPHs, derived from natural decomposition of organic compounds, might be detected in samples of fill dirt, the PCHB *686 was not persuaded by this argument and set the criteria for TPH at 0, also in condition 7.[28]
Ecology and the PCHB disagree as to their preferred methods for setting fill criteria, which in turn leads to disagreement as to ultimate fill criteria for several substances. The PCHB preferred to start with natural background levels, then refer to back calculations based on surface and groundwater criteria, and then refer to MTCA Method A standards. Ecology started with Method A, then turned to back calculations, then compared the result with natural background and PQL levels to raise criteria if necessary.
The Port argues that the PCHB's adjustments made the ultimate fill criteria "significantly, and unnecessarily, more stringent." Port's Opening Br. at 30. The Port claims first that the PCHB arbitrarily and capriciously adjusted the fill criteria without a finding that ACC showed by a preponderance of the evidence that Ecology's criteria were inadequate. Ecology agrees and also asserts that the PCHB acted outside its authority and based its condition on factual findings not supported by substantial evidence. Finally, Ecology argues that the PCHB should have deferred to its expertise on such a technical judgment.
In order to justify adjusting the fill criteria, the PCHB should first have found that the § 401 certification criteria were inadequate. See, supra, part IV.A.1. There is nothing in PCHB's opinion or the record that explains why natural soil levels are more relevant to protecting ground and surface water quality than back calculations from the ground and surface water standards themselves. Although the PCHB refers to former WAC 173-201A-040(1), which refers to natural background levels, that rule applies to natural levels in waters of the state, not in soil. Moreover, setting fill criteria at natural background levels is problematic because those levels are set at the 90th percentile; 10 percent of naturally occurring, uncontaminated soils exceed those background levels. PCHB Dec. at 59-60. Where multiple substances are at issue, the chance of a pristine fill source exceeding the background level for at least one substance becomes significant. Neither ACC and CASE nor the PCHB points to any evidence or law that supports setting numeric fill criteria by looking first to natural soil background levels. Therefore, we conclude that the PCHB misinterpreted the law and acted arbitrarily and without the support of sufficient evidence when it required fill criteria to be set first at natural background soil concentrations.
ACC and CASE argue the PCHB reasonably concluded that back-calculated levels should govern over the Method A cleanup standards. The MTCA Table 740-1 sets Method A soil cleanup levels that Ecology used to set criteria for arsenic, cadmium, chromium, lead, mercury, gas, diesel, and heavy oils. WAC 173-340-900 (Tables). The cleanup level for lead is based on "preventing unacceptable blood lead levels" while the rest are set to protect "ground water for drinking water use." Id. Table 740-1, at notes j, s, b, e, f1, f2, m, s. The PCHB expressed concern that Ecology, in these cases, ignored the back-calculated levels for these substances, which were derived directly from surface and groundwater quality standards. This concern is supported by evidence that even Ecology's experts expressed doubts as to the propriety of using MTCA levels because they contemplate impacts only on humans, but not impacts on "plants, animals, wildlife, [and] surface water." AR at 28828-29 (deposition of Peter Kmet); AR at 17496 (e-mail from Kmet to Chung K. Yee).
Even so, the PCHB did not adequately address its threshold determination, namely whether ACC and CASE had shown by a preponderance of the evidence that Ecology's fill criteria were inadequate to ensure compliance with water quality standards. See, supra, part IV.A.1. Although the PCHB found evidence in the record supporting an alternative method for arriving at fill criteria, it did *687 not adequately support its conclusion that Ecology's choice of methods was inadequate. In fact ACC's own witness admitted that he had not reviewed anything that would indicate that the § 401 criteria would lead to water quality violations. Therefore, we hold that the PCHB erroneously interpreted and applied the law and acted arbitrarily and capriciously when it adjusted Ecology's method for determining fill criteria without first finding, by a preponderance of the evidence, that Ecology's method was inadequate.
In addition to adjusting Ecology's calculations, the PCHB also found that Ecology set levels for selenium and silver based on incorrect PQLs. The PCHB is correct that actual data from the Port shows that those substances can in fact be detected at much lower levels. This evidence supports the PCHB's finding that Ecology's criteria for those metals were inadequate. Therefore, we hold that the PCHB reasonably objected to the fill criteria for selenium and silver; Ecology must recalculate these fill criteria based on correct PQLs.
Finally, the Port and Ecology argue that the PCHB improperly reduced the criteria for TPH (including gas, diesel, and heavy oils) to 0. Although the Port argued that TPH levels might appear in uncontaminated samples because of the natural decomposition of organic compounds, the PCHB was not persuaded by this argument. Instead, the PCHB was convinced by testimony from Ecology's expert, Kevin Fitzpatrick, who stated during the hearing:
But in putting these unnatural constituents into the criteria, it was an error in our logic in that you would not have what are essentially man-made constituents on an uncontaminated site. So ... we should never be getting or we should never be even considering a site that's contaminated, and only a contaminated site would have gasoline, diesel, or heavy oils on it. So I will concede that by providing these as criteria it does not follow in on our logic of prohibiting contaminated fill sources.
AR 55812 (testimony of Kevin Fitzpatrick, Ecology expert). Although other experts testified that naturally occurring multichained hydrocarbons could be detected as gas, diesel, or heavy oil, the PCHB apparently found Mr. Fitzpatrick's testimony to be more credible. Because this court will defer to the PCHB's determinations as to witness credibility, we conclude that there was substantial evidence in the record to support a finding that Ecology's § 401 certification fill criteria for gas, diesel, and heavy oils were not adequate. Therefore, we overturn condition 7 but require Ecology to recalculate fill criteria for selenium and silver based on correct PQLs and set fill criteria for TPH at 0.
2. SPLP Procedure: If potential fill material exceeds the numeric criteria, the September § 401 certification allows the Port to use the SPLP to assess whether a particular contaminant will leach from the soil into ground or surface water at a rate that will threaten water quality. The SPLP procedure involves placing fill material in a container with the equivalent of acid rain and agitating the mixture for several hours. The lab then extracts the water (now leachate) and tests it to determine how much of the soil's contaminants actually leached into the water. The results are compared to surface water quality criteria to determine whether those criteria would actually be violated if the fill were used.
The PCHB determined that use of the SPLP process to approve fill dirt that exceeds the § 401 certification's numeric fill criteria would not be protective of water quality. Therefore, the PCHB added condition 8, which states that "[t]he SPLP process may not be used to authorize the importation of fill that exceeds the modified fill criteria." PCHB Dec. at 137.
a. Effect of LAWS OF 2003, ch. 210: Ecology and the Port first argue that Laws of 2003, ch. 210 (hereinafter, chapter 210) conclusively approves the inclusion of the SPLP process in the § 401 certification by adding the following provision to chapter 90.48 RCW (water pollution control):
(1) In order to ensure that construction projects involving the use of fill material do not pose a threat to water quality, the department may require that the suitability *688 of potential fill material be evaluated using a leaching test included in the soil clean-up rules adopted by the department under chapter 70.105D RCW in any water quality certification issued under section 401 of the federal clean water act and in any administrative order issued under this chapter, where such certification or administrative order authorizes the placement of fill material, some or all of which will be placed in waters of the state. Any such requirement imposed by the department in a water quality certification or administrative order issued prior to the effective date of this section is ratified and approved by the legislature as a valid and reliable method for determining concentrations of chemical constituents that can be present in fill material without posing an unacceptable risk of violating water quality standards, and shall be in effect as imposed by the department for all work not completed by June 1, 2003.
(2) Nothing in this section limits, in any way, the department's authority under this chapter.
LAWS OF 2003, ch. 210 (emphasis added).
i. Separation of Powers: ACC and CASE contend that retroactive application of chapter 210 violates the separation of powers doctrine because the legislature has attempted to overturn a specific order of the PCHB and has thereby encroached upon this court's power to decide this case. The separation of powers doctrine arises out of "the constitutional distribution of the government's authority into three branches." State v. Moreno, 147 Wash.2d 500, 505, 58 P.3d 265 (2002). While no provision of law should threaten the independence or integrity of the judicial branch, id. at 506, 58 P.3d 265, the branches are not "hermetically sealed." Carrick v. Locke, 125 Wash.2d 129, 135, 882 P.2d 173 (1994).
In City of Tacoma v. O'Brien, 85 Wash.2d 266, 534 P.2d 114 (1975), this court considered legislation that found that a substantial increase in the cost of petroleum products had rendered many public works contracts "`economically impossible.'" Id. at 269-70, 534 P.2d 114 (quoting LAWS OF 1974, 1st Ex.Sess., ch. 194). The O'Brien court explained that "[w]hile a court will not controvert legislative findings of fact, the legislature is precluded ... from making judicial determinations" or "legal conclusion[s]." Id. at 271-72, 534 P.2d 114. A legal conclusion is "a result which follows from examination and consideration of circumstances in a particular case and interpretation and application of legal principles to those facts." Id. at 272, 534 P.2d 114. Thus, an adjudication as to the economic impossibility of existing contracts violated the separation of powers doctrine. Id. More recently, in Sofie v. Fibreboard Corp., 112 Wash.2d 636, 654, 771 P.2d 711, 780 P.2d 260 (1989), this court noted that the legislature cannot make case by case applications of the law to particular facts.[29]
However, the legislature may pass a law that directly impacts a case pending in Washington courts. Haberman v. Wash. Pub. Power Supply Sys., 109 Wash.2d 107, 143-44, 744 P.2d 1032, 750 P.2d 254 (1987). In Haberman, this court evaluated a retroactive amendment adding a scienter requirement to the civil liability provisions of the relevant statute in that case. Id. at 137. The Haberman court held that "[a] statute prescribing new rules to be applied to pending litigation is generally constitutional [and] does not violate the separation of powers clause." Id. at 143. Because the retroactive amendment did not "impede upon the court's right and duty to apply new law to the facts of this case," "dictate how the court should decide a factual issue," or "affect a final judgment," but instead constituted a "facially neutral law for the court to apply to the facts before it," it did not violate the separation of powers. Id. at 144.
ACC, CASE, and amici, the Environmental Organizations, offer transcripts of committee hearings on chapter 210, suggesting that the legislature intended to impact the outcome of this case in particular. See Combined Resp. Br. of ACC and CASE, App. D (Committee Transcripts). Indeed the committee hearing *689 transcripts indicate that the third runway project was specifically discussed, Combined Resp. Br. of ACC and CASE, App. D at 16; App. E at 15; and the September § 401 certification is the only existing certification which would be affected by this retroactive legislation.
It is the prerogative of the legislature to determine the scientific procedures that will best protect water quality, and this court should not substitute its judgment for that of the legislature. See Weden v. San Juan County, 135 Wash.2d 678, 704-05, 958 P.2d 273 (1998); State v. Brayman, 110 Wash.2d 183, 192-93, 751 P.2d 294 (1988). The legislature has broad authority to dictate whether the SPLP test is an acceptable procedure in Washington. See Seeley v. State, 132 Wash.2d 776, 799, 940 P.2d 604 (1997) (noting that where experts disagree, the court has refused to substitute its judgment for that of the legislature). By making chapter 210 retroactive, the legislature prescribed a facially neutral law for this court to apply to pending litigation. See Haberman, 149 Wash.2d at 143, 744 P.2d 1032, 750 P.2d 254. However, the legislature did not make a case by case application of the law to particular sets of facts. See LAWS OF 2003, ch. 210.
With regard to the retroactive application of chapter 210, the Port correctly argues that a new, retroactive law must be applied by appellate courts when reviewing judgments on appeal, even if the new law alters the outcome. See Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 226-27, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995) (discussing this rule with regard to federal courts). Although the legislature may not retroactively overrule a decision of the State's highest court, the legislature may clarify a law in response to an administrative adjudication or trial court decision. See McGee Guest Home, Inc. v. Dep't of Soc. & Health Servs., 142 Wash.2d 316, 324-25, 12 P.3d 144 (2000); see also Overton v. Wash. State Econ. Assistance Auth., 96 Wash.2d 552, 556-58, 637 P.2d 652 (1981). Thus, if the legislature clearly intended chapter 210 to be retroactive, then the legislation may impact pending cases. In re Det. of Brooks, 145 Wash.2d 275, 285, 36 P.3d 1034 (2001). Here the legislature clearly stated that chapter 210 was to be applied retroactively. Thus, chapter 210 governs the outcome of the SPLP issue in this case because the legislation does not contravene a prior judicial construction of a statute by this court. In sum, retroactive application of chapter 210 to this case is proper and does not violate the separation of powers doctrine.
ii. Special Legislation: ACC and CASE also assert that chapter 210 is unconstitutional special legislation. Article II, section 28 of the Washington Constitution prohibits the legislature from enacting any private or special laws that grant corporate powers or privileges, legalize an unauthorized or invalid act of a state officer, or limit civil or criminal actions. CONST. art. II, § 28(6), (12), (17). Special legislation "operates upon a single person or entity while general legislation operates upon all things or people within a class." Brower v. State, 137 Wash.2d 44, 60, 969 P.2d 42 (1998). A class may currently consist of only one member, so long as the legislation would apply to all members of a class. Id. The test of special legislation is what it excludes, not what it includes. Id. "`"[A]ny exclusions from a statute's applicability, as well as the statute itself, must be rationally related to the purpose of the statute."'" Id. (quoting Island County v. State, 135 Wash.2d 141, 150, 955 P.2d 377 (1998) (quoting City of Seattle v. State, 103 Wash.2d 663, 674-75, 694 P.2d 641 (1985))).
Although they do not contest the substance of chapter 210, so long as it is applied prospectively, ACC and CASE contend that there is no rational basis for giving chapter 210 retroactive effect. Combined Resp. Br. of ACC and CASE at 45. They point to City of Seattle, in which the legislature passed legislation applicable only to cities of over 400,000 residents. 103 Wash.2d at 673, 694 P.2d 641. While the court recognized that population can serve as a rational means for determining whether a city has the resources to exercise a particular authority, in that case the court found no rational reason why the legislature chose to apply this statute only to cities with a population over 400,000. Id. at 677, 694 P.2d 641. The legislative history *690 also indicated that the legislation was passed with the intent to impact a particular annexation. Id. Thus, the court concluded that the legislation was invalid. Id.
In this case, the legislature retroactively ratified any Ecology approval of the SPLP process in a § 401 certification where the work would not be completed by June 1, 2003. LAWS OF 2003, ch. 210. The only project impacted by this retroactivity clause is the third runway project. Thus, ACC and CASE contend that the sole retroactive application to this project is irrational. However, ACC and CASE do not point to any irrational exclusion from the class of projects impacted by this legislation. Because this court has clearly stated that a class may consist of one member, so long as there is no irrational exclusion from the class, ACC and CASE have not shown that chapter 210 is unconstitutional special legislation.
iii. Preemption: Additionally, ACC and CASE claim that the federal Clean Water Act preempts chapter 210 because the legislation mandates certification where no reasonable assurance exists. The Environmental Organizations make a slightly different preemption argument, claiming that the legislature cannot unilaterally relax state water quality standards without the federal EPA's approval. However, these arguments are unconvincing in light of the fact that the EPA developed and adopted the use of the SPLP procedure. Graves, 280 F.Supp.2d at 1224. Thus, there is nothing to suggest that the EPA or any other federal agency would interpret use of the SPLP procedure to conflict with the Clean Water Act. Therefore, we conclude that chapter 210 is not preempted by the federal Clean Water Act.[30]
b. Application of the SPLP Process in this Case: The PCHB was concerned that the current SPLP protocol requires comparison of the leachate with surface water quality standards but not groundwater quality standards. Both the Port and Ecology concede that the § 401 certification should require the Port to compare the SPLP leachate against both surface and groundwater quality standards. Thus, we hold that Ecology must amend the § 401 certification to include a requirement that SPLP leachate be tested against both surface and groundwater quality criteria.
Although ACC and CASE have raised other arguments in favor of rejecting use of the SPLP process in this case, none of those arguments survives in light of chapter 210. Therefore, we overturn PCHB condition 8 but require Ecology to amend the § 401 certification such that the SPLP leachate must be compared against both surface and groundwater criteria.
E. Water Quality and Stormwater Quality
1. Mixing Zones: The third runway project will require instream construction activities, including the destruction of existing bridge abutments. These construction activities will disturb sediments in the streams, causing temporary turbidity. Former WAC 173-201A-110(3) (1997) authorizes temporarily turbid conditions within a "mixing zone," extending a designated distance downstream from construction. Water quality standards must be met at the far edge of the mixing zone.
*691 The § 401 certification requires the Port to submit to Ecology a monitoring plan for each instream construction project for approval before instream construction may begin. Each monitoring plan must demonstrate that the size and turbidity of mixing zones will be minimized. If monitoring reveals that turbidity standards are not being met at the boundary of the mixing zone, measures must immediately be taken to reduce turbidity. Finally, the § 401 certification "does not authorize temporary exceedances of water quality standards beyond the limits established in [former] WAC 173-201A-110(3)." AR at 7443.
The PCHB clarified that "any construction mixing zone would presumably be 100 feet downstream of any construction where the stream flow is less than 10 cfs, [former] WAC 173-201A-110(3)(a), or such smaller area determined in the monitoring plan. No other mixing zone is authorized or permitted by the § 401 certification." PCHB Dec. at 114. The PCHB then concluded that ACC and CASE failed to meet their burden in challenging the mixing zone provision. Id.
In addition to governing the size of temporary mixing zones, former WAC 173-201A-110(3) prohibits mixing zones that would result in the drastic losses listed in former WAC 173-201A-100(4) (1992). The size of the mixing zone and the concentration of the pollutants must also be minimized. Former WAC 173-201A-110(3) (incorporating former WAC 173-201A-100(6) by reference). Finally, all state and local permits must have been granted and best management practices must be implemented to avoid disturbance of sediments. Former WAC 173-201A-110(3).
CASE now contends that Ecology and the PCHB erroneously interpreted and applied the law by allowing temporary mixing zones that do not comply with former WAC 173-201A-110(3). CASE asserts that former WAC 173-201A-110(3) requires Ecology to review and approve the use of temporary mixing zones before authorizing their use. Under the § 401 certification, the Port is required only to submit a monitoring plan, not a complete description of how the temporary mixing zone will comply with former WAC 173-201A-110(3). CASE claims that this failure eliminates reasonable assurance.
However, CASE has misinterpreted former WAC 173-201A-110(3). As the agency that promulgated the regulation, Ecology's interpretation is entitled to deference. Postema, 142 Wash.2d at 86, 11 P.3d 726. Ecology's witness testified that Ecology read the temporary mixing zone regulation to authorize temporary mixing zones that comply with former WAC 173-201A-110(3), without prior approval from Ecology. While other short term modifications of water quality standards clearly require written preapproval from Ecology, see former WAC 173-201A-110(1), (2), a temporary turbidity mixing zone "is authorized" when the requirements of the provision have been met. Former WAC 173-201A-110(3). None of CASE's arguments for interpreting former WAC 173-201A-110(3) differently are convincing in light of the deference this court gives to Ecology's interpretation of its own regulations. Therefore, the PCHB was correct in holding that ACC and CASE did not meet their burden of showing by a preponderance of the evidence that the mixing zone section of the § 401 certification would lead to violations of water quality standards. We affirm the PCHB's conclusion with regard to mixing zones.
2. WER Studies: Certain water conditions can make hazardous substances more or less bioavailable to organisms living in a stream, impacting toxicity.[31] A site specific WER study determines whether there are local conditions in a stream, like a high concentration of organic matter or suspended particles that influence toxicity when substances enter that stream. The WER study determines a substance's toxicity in the actual stream water and then compares it to the toxicity in lab water, resulting in a ratio. Then, the generic numeric water quality standard in former WAC 173-201A.040 is adjusted for the particular characteristics of the stream water according to the ratio.
*692 The § 401 certification declares that stormwater generated by the third runway project may not be discharged into state receiving waters until a site specific WER study is completed and approved by Ecology. Appropriate limitations and monitoring requirements must then be included in the Port's NPDES permit. Copper and zinc are metals of concern in Miller, Walker, and Des Moines Creeks. Therefore, the Port conducted preliminary range finding WER studies in order to predict the range of possible WER results. Copper was shown to be somewhere between 6 and 28 times less toxic in the stream water than it was in lab water. Therefore, the numeric water quality criteria could be increased by a factor of 6 to 28 times before sensitive species in the creeks would be impacted, depending on the results of the final WER Study.
The PCHB concluded that the "WER study results shall only be used if the data suggests the water quality criterion should be lowered; i.e., made stricter" in condition 5. PCHB Dec. at 39, 136. However, contrary to its ultimate holding, the PCHB found that the standard resulting from a WER study "gives the necessary level of protection intended by the more generic (laboratory water) standard, but with the standard adjusted for the particular characteristics of the water in that particular stream." Id. at 37. The PCHB also stated that:
Ecology witnesses indicated that the WER Study would not lessen any of the standards. It will just provide a more accurate translator as to how the metal is actually behaving in the receiving water and thus is designed to produce a site-specific standard that is fully protective of the organisms within the streams.
Id. at 38.
The Port and Ecology challenge the PCHB's limitation on the application of WER testing. They argue that allowing WER studies only to make water quality criteria more strict eviscerates the purpose of WER testing and conflicts with Ecology's regulations. They also argue that the PCHB condition was arbitrary and capricious and was not supported by substantial evidence.
In support of condition 5, the PCHB first asserts that to allow the WER study to relax water quality standards would "be contrary to the clear objectives of the state and federal water pollution laws of eliminating pollution to the nation's waters from all discharges, including those of stormwater." Id. at 113. However, the federal EPA specifically encourages the use of WER studies. Based on the EPA's guidelines, Ecology has developed its own guidelines for conducting WER studies. The use of WER studies is specifically allowed by former WAC 173-201A-040(3), which states "[t]he department may revise the following criteria on a statewide or waterbody-specific basis as needed to protect aquatic life occurring in waters of the state and to increase the technical accuracy of the criteria being applied." "Metals criteria may be adjusted on a site-specific basis when data are made available to the department clearly demonstrating the effective use of the water effects ratio approach established by the USEPA [United States Environment Protection Agency]." Id. Notes to Table at dd (applying rule to all metals listed in the former WAC 173-201A-040(3) water quality criteria). Finally, any adjustment to water quality criteria for a particular water body must be formally adopted according to the procedural requirements in chapter 34.05 RCW. Former WAC 173-201A-040(3). In sum, both the EPA and Ecology have adopted the WER study as a tool for establishing site specific water quality criteria. Ecology's rules with regard to WER studies do not limit their application; WER studies may be used to adjust water quality criteria to make them either more strict or more lenient.
ACC and CASE argue that the PCHB condition 5 does not conflict with Ecology regulations because former WAC 173-201A-040(3) allows WER studies only "as needed to protect aquatic life occurring in waters of the state and to increase the technical accuracy of the criteria being applied." (Emphasis added.) ACC and CASE contend that though site specific water quality criteria will be more technically accurate, they are not needed to protect aquatic life. However, Ecology has read former WAC 173-201A-040(3) to allow WER studies both when they *693 are needed to protect aquatic life and when they are needed to increase technical accuracy and has called for the WER study at SeaTac to increase technical accuracy. Ecology's interpretation of its own regulation is entitled to great weight. ACC and CASE have not presented arguments sufficient to overcome this deference. Therefore, we adopt Ecology's reading of former WAC 173-201A-040(3).
The PCHB also justified condition 5 by pointing to multiple contributors of pollutants to area streams and the difficulty in regulating stormwater. However, it is unclear why these concerns justify departure from Ecology's rule in this case. This court may grant relief if the PCHB order is inconsistent with an applicable rule, unless the PCHB has provided a rational basis for the inconsistency. RCW 34.05.570(3)(h). Yet the difficulty in regulating hazardous substances in stormwater and the possibility of multiple contributors to a particular water body are both overarching concerns. Neither ACC and CASE nor the PCHB offers any evidence that Ecology failed to take these factors into account when promulgating former WAC 173-201A-040(3).
In addition, to support condition 5 the PCHB relied on the fact that past stormwater sampling was inadequate, in order to justify its departure from Ecology's regulations. However, a separate, unchallenged PCHB condition requires upstream and downstream monitoring of stormwater outfalls and monitoring of hardness data to address prior sampling deficiencies. Moreover, the § 401 certification and Ecology's WER guidelines impose additional sampling requirements. Thus, monitoring concerns do not justify limiting the application of the WER study. In fact, because the PCHB relied on the unchallenged monitoring condition for reasonable assurance, it would be contradictory and unreasoning to conclude that historical monitoring problems will continue.[32]
In sum, the PCHB did not adequately support its condition limiting the application of the WER study such that it can be used to tighten but not relax water quality standards. Notably, the PCHB never specifically concluded that unlimited application of the WER study will not be protective of water quality. In fact, the PCHB stated that a standard adjusted according to a WER study "gives the necessary level of protection intended by the more generic (laboratory water) standard, but with the standard adjusted for the particular characteristics of the water in that particular stream." PCHB Dec. at 37. Moreover, condition 5 is contrary to former WAC 173- 201A-040(3), and the PCHB does not offer a rational basis for ignoring the rule in this case. Finally, the PCHB cannot properly use monitoring concerns to justify departure from the rule because those concerns will necessarily be alleviated by the PCHB's unchallenged monitoring condition. Therefore, we overturn PCHB condition 5.
F. Wetland Mitigation
For the § 401 certification to be valid, there must be reasonable assurance that impacts to wetlands will be mitigated in accordance with the applicable antidegradation policy. PCHB Dec. at 127; former WAC 173-201A-070. Existing beneficial uses must be maintained and protected and no further wetland degradation shall be allowed. See former WAC 173-201A-070(1). The third runway project will impact a total of 21.34 acres of wetlands (19.29 acres permanently and 2.05 acres temporarily). The Port must mitigate these impacts by providing two acres of wetland mitigation for every one acre of wetland impacted by the third runway project. Therefore, the Port's plan must contain 42.68 mitigation credits.
*694 The Port created a Natural Resources Mitigation Plan (NRMP) which proposes mitigation in-basin and out-of-basin. The Port's in-basin mitigation includes various levels of improvement to over 112 acres of land, including enhancement of urban streams, removal of septic systems, and replacement of "lawns, golf courses, farmland, streets, driveways, and home sites." PCHB Dec. at 75. Out-of-basin mitigation would occur on a 65-acre site in Auburn, where the Port would establish forested wetland, shrub wetland, emergent wetland, open water, wetland habitat, and buffers. Out-of-basin mitigation was proposed because of serious concerns regarding aircraft safety. Specifically, the Port must take care not to create new wildlife attractants near runways because waterfowl and flocking birds present significant hazards to commercial aviation. The Auburn out-of-basin mitigation remains in the same water resource inventory area as the airport.
Under the § 401 certification the Port would receive varying levels of wetland mitigation credit for each proposed project, depending on the degree to which the project will replace wetland function. For example, wetland restoration would receive 1:1 credit, while enhancement would receive 1:2 credit. Notably, Ecology allowed 3.06 wetland enhancement credits for the surface of Lora Lake.
ACC and CASE argued to the PCHB that Ecology improperly gave credit for projects which should not be considered "restoration," Ecology improperly gave credit for the surface of Lora Lake, Ecology improperly gave credit for preserving wetlands that were already subject to protection, and the Port did not reasonably exhaust its search for in-basin wetland mitigation. As a result, the PCHB added condition 11 to the § 401 certification stating:
11. The Port shall mitigate for on-site wetland loss at the ratio of no less than 2:1. This ratio shall not include wetland buffers or preserving wetlands that are already protected. In order to meet this ratio, the Port is urged to consider enhancing the Walker Creek headwaters wetlands.
Id. at 137. The PCHB subtracted credit for the surface of Lora Lake, buffer enhancements,[33] and preservation of already preserved wetlands. After doing so, the Port was left with 20.05 acres of mitigation credit for in-basin mitigation. Without giving credit for out-of-basin mitigation, the PCHB concluded that the Port had not yet fully mitigated the impacts of the third runway project.
1. Sufficiency of Plan With Regard to Vacca Farm ACC and CASE argued to the PCHB that the Port received too much credit for enhancement of the Vacca Farm site. The Port would classify the Vacca Farm work as restoration, receiving 1:1 credit, while ACC and CASE would classify it as enhancement, receiving only 1:2 credit. ACC and CASE argued that the Vacca Farm site was not sufficiently degraded to qualify for restoration.
The PCHB concluded that the distinction between restoration and enhancement is one best left to Ecology's professional judgment, and ACC and CASE did not show that Ecology's biological judgment here was flawed. At the Vacca Farm site, wetland that has traditionally been used for farming and grazing will be returned to its historic peat wetland condition. The Vacca Farm site was degraded enough that Ecology could reasonably conclude that it would qualify for restoration.
ACC and CASE now argue that the PCHB erroneously interpreted or applied the law by allowing restoration rather than enhancement credit for Vacca Farm. The PCHB defined restoration to mean "the re-establishment of a wetland in an area where a wetland historically existed, but which now performs little or no wetland functions." PCHB Dec. at 81. In contrast, enhancement means "increasing one or more functions of an existing wetland." Id. However, the PCHB recognized that those definitions are changing. Enhancement also means "improving or enhancing *695 one or more [wetland] functions" while restoration also means "returning a degraded system to a former condition." Id. at 81.[34] The PCHB concluded that under either definition, a wetland need not be completely without function to qualify for restoration. Because the Vacca Farm site would be returned to its historic peat wetland condition, the PCHB determined that Ecology had exercised appropriate professional judgment in classifying the work as restoration.
ACC points out that, in the context of the third runway condemnation action, Ecology had already classified the Vacca Farm site as an existing wetland. ACC argues that Ecology erred when it then inconsistently targeted the Vacca Farm site for restoration rather than enhancement. However, the PCHB correctly stated that a degraded wetland can be restored. Thus, the prior classification of the land as wetland and the finding that the wetland can be restored are not inconsistent. Therefore, we defer to Ecology's judgment and hold that Ecology and the PCHB properly counted proposed work at the Vacca Farm site as restoration.
2. Out-of-Basin Mitigation: The PCHB noted that RCW 90.74.020(2) allows for out-of-basin mitigation for public infrastructure projects but stated that "out-of-basin mitigation should occur only after all reasonable in-basin options have been evaluated." Id. at 130. Acceptable reasons for choosing out-of-basin mitigation would include consideration of whether available options are sustainable and whether in-basin opportunities conflict with important public health or safety policies, like the need to minimize bird strikes. The PCHB concluded that "[p]rofessional judgment is required to evaluate whether a large wetland creation would be more beneficial to the flora and fauna of the area than a series of dispersed smaller wetlands," id. at 83, but found that the Port had overlooked in-basin mitigation opportunities simply because they involved relatively small areas. Id. at 81. Thus, the PCHB added the final sentence in condition 11, urging the Port to consider enhancing the Walker Creek headwaters in place of out-of-basin mitigation.[35]
The Port now contends that, even subtracting credits for wetland buffers, preservation of already preserved wetlands, and the surface of Lora Lake,[36] its remaining credits are sufficient if the Port is allowed to count its out-of-basin mitigation. (20.05 in-basin mitigation + 29.98 out-of-basin (wetland creation) + 9.75 out-of-basin (enhancement) = 59.78 mitigation credits, amounting to more than the required 42.68 mitigation credits.) Thus, the Port challenges only the part of condition 11 that urges the Port to consider enhancing the Walker Creek headwaters in place of out-of-basin mitigation.
The Port argues that the PCHB's refusal to count its out-of-basin mitigation was contrary to RCW 90.74.020(2). The Port also argues that the PCHB's decision was arbitrary since the Board recognized both the bird strike hazard that motivated the Port to move its mitigation off-site and the high quality of bird attracting wetlands that would be created by the out-of-basin mitigation. Finally, the Port emphasizes that some experts testified that all in-basin mitigation opportunities have already been considered.
The legislature has found that "traditional on-site, in-kind mitigation may provide fewer environmental benefits when compared to innovative mitigation proposals." RCW 90.74.005(1)(c). Thus, for projects involving infrastructure development:
[t]he departments of ecology and fish and wildlife may not limit the scope of options in a mitigation plan to areas on or near the *696 project site, or to habitat types of the same type as contained on the project site. The departments of ecology and fish and wildlife shall fully review and give due consideration to compensatory mitigation proposals that improve the overall biological functions and values of the watershed or bay and accommodate the mitigation needs of infrastructure development.
The departments of ecology and fish and wildlife are not required to grant approval to a mitigation plan that the departments find does not provide equal or better biological functions and values within the watershed or bay.
RCW 90.74.020(2). For the purposes of chapter 90.74 RCW, "watershed" means "an area identified as a state of Washington water resource inventory area under WAC 173-500-040." RCW 90.74.010(6). The PCHB properly noted the legislature's limitation on Ecology's ability to reject an otherwise adequate, out-of-basin plan but concluded that "out-of-basin mitigation should occur only after all reasonable in-basin options have been evaluated." PCHB Dec. at 130.
However, nothing in chapter 90.74 RCW suggests that the legislature intended to require mitigators to first exhaust in-basin mitigation opportunities. Moreover, Ecology's acceptance of the high quality out-of-basin mitigation makes sense, in light of the potential checkerboard character that a collection of smaller wetlands might exhibit, and the doubts as to the level of elevated functions that the Walker Creek headlands could provide. Given the legislature's clear message that mitigators should not be limited to in-basin mitigation, and given Ecology's conclusion that the combination of in-basin and out-of-basin mitigation was adequate, the PCHB's failure to count the Port's out-of-basin mitigation seems contrary to Washington law.
ACC seems to argue that the Clean Water Act preempts reliance on RCW 90.74.020 because the federal law does not allow states to create state water quality laws that fall below federal thresholds. However, ACC does not show that chapter 90.74 RCW violates Clean Water Act threshold standards. In fact, the Army Corps of Engineers has determined that off-site mitigation can comply with the Clean Water Act. See 33 C.F.R. § 320.4(r) (authorizing off-site mitigation, generally); 33 C.F.R. § 325.4(a)(3).
ACC also contends that out-of-basin mitigation cannot comply with state water quality standards in this case. However, ACC provides no specific citation to support its assertion that degradation of water quality in Miller, Des Moines, or Walker Creeks cannot be mitigated by actions taken within the same water resources inventory area. Indeed, the legislature has clearly stated otherwise. ACC obviously does not agree with the legislature's policy decision to allow out-of-basin mitigation but such arguments must be targeted at the legislature.
ACC also seems to argue that the separation of powers doctrine somehow prevents application of chapter 90.74 RCW in this case. ACC seems to take issue with the fact that the legislature's general rule, allowing out-of-basin mitigation proposals, removes discretion from Ecology, the PCHB, and this court. Yet because chapter 90.74 RCW does not require either the court or Ecology to approve a mitigation plan that does not meet Washington's antidegradation standard, ACC's separation of powers argument fails. In sum, ACC does not provide any convincing argument to support a conclusion that this court should prohibit out-of-basin mitigation for this project. Therefore, we overturn the final sentence in PCHB condition 11. We also hold that when counting the remaining in-basin and out-of-basin mitigation, the Port's plan adequately mitigates for the impacts of the third runway.
G. Evidentiary Rulings
1. Redactions of Deposition Testimony: ACC and CASE took depositions from several Ecology officials in which those officials referred to meetings among the Port, Ecology, and Governor Locke's staff. Apparently, ACC and CASE hoped to argue that it was pressure from the governor's office that motivated Ecology to retract the August § 401 certification and reissue the arguably more lenient September § 401 certification. However, the PCHB concluded that "materials related to political pressure *697 or intrigue are not relevant to the questions before the Board." AR at 921. ACC and CASE now contend that the PCHB should have considered the deposition testimony because it reveals factors that influenced Ecology's decisions. This court reviews evidentiary rulings for abuse of discretion. Maehren v. City of Seattle, 92 Wash.2d 480, 488, 599 P.2d 1255 (1979).
The PCHB's evidentiary decisions are guided by the rules of evidence. WAC 371-08-300(1). Except where they conflict with the PCHB's rules, Washington's rules of evidence govern, unless the presiding officer determines that the evidence in question is "the kind of evidence on which reasonably prudent persons are accustomed to rely in the conduct of their affairs." WAC 371-08-500(1); see also WAC 371-08-300(2). Thus, the PCHB can exclude irrelevant evidence. See ER 401. In fact, the PCHB has traditionally found that evidence regarding Ecology's deliberative process is irrelevant because PCHB conducts its hearings de novo. Jerome Rosa v. Dep't of Ecology, PCHB Nos. 01-083, 01-024, 2002 WL 1650497, at *2 (Apr. 3, 2002) (prehearing order).
ACC and CASE have not offered any convincing argument to support a holding that the PCHB abused its discretion when it redacted the deposition testimony based on relevance. The PCHB was faced with the question of whether Ecology's September § 401 certification indeed provided reasonable assurance that state water quality standards would be met. Thus, there is no reason why Ecology meetings with the governor's office would have been relevant to this specific question. In sum, we conclude that the PCHB acted within its discretion when it redacted the deposition testimony at issue.
2. Inadvertently Disclosed Privileged Document: In a meeting occurring before the § 401 certification was issued, an assistant attorney general advised Ecology that a water right would be required to detain and then later release stormwater into the creeks. This conclusion was documented by an Ecology employee and that document was subsequently released from Ecology to ACC, pursuant to a routine public disclosure act, chapter 42.17 RCW, request. The PCHB concluded that the attorney's opinion was privileged and ordered that the privileged information be stricken from the record.
Even if the PCHB was somehow incorrect in its reading of the law, ACC was not prejudiced by the evidentiary ruling because the PCHB ruled in ACC's favor on the water right issue. See Davidson v. State, 116 Wash.2d 13, 29, 802 P.2d 1374 (1991) (exclusion of testimony was reversible error only if the admission of the testimony would have impacted the outcome of the case). ACC declares that it suffers prejudice because the PCHB's ruling prevents this court from considering the assistant attorney general's opinion. However, an Ecology employee's notes as to the opinion of an attorney, without legal citation or reasoning, are not relevant to this court's resolution of the legal question of whether a water right is required for the third runway project. Therefore, we conclude that the ACC was not prejudiced by the PCHB's ruling excluding the inadvertently disclosed document.[37]

V

Conclusion
In sum, we affirm the PCHB's conclusion that there is reasonable assurance that the third runway project will not violate Washington water quality standards. We affirm PCHB conditions 1-4, 9-10, the first two sentences of condition 11, and conditions 12-15, allowing those conditions to become part of Washington's § 401 certification. However, we overturn conditions 5, 6, the last sentence of condition 11, and condition 16. We overturn condition 7 but require Ecology to recalculate fill criteria for selenium and silver based on correct PQLs and set fill criteria for TPH at 0. We also overturn condition 8 but hold that SPLP results must be compared *698 against both surface and groundwater quality criteria. Finally, we conclude that the PCHB acted within its discretion when it redacted deposition testimony, and ACC is not entitled to relief for the exclusion of the inadvertently disclosed document.
ALEXANDER, C.J., JOHNSON, MADSEN, SANDERS, IRELAND, CHAMBERS, OWENS, and FAIRHURST, JJ., concur.
NOTES
[1] Facts specific to individual issues will be discussed in detail below.
[2] The PCHB added the following conditions:

1. BMPs [best management practices] shall be selected from the enhanced treatment list for better removal of dissolved metals;
2. The Port shall sample of [sic] stormwater above and below stormwater outfalls and a[sic] monitor the hardness of the receiving waters;
3. Water quality testing for toxicity to sensitive organisms, by the Port and approved by Ecology, shall measure injury, as well as mortality of those organisms;
4. 100% of the stormwater management facility retrofit shall be completed by the time 50% of the impervious surfaces have been constructed;
5. Use of the WER [Water Effects Ratio] study is limited so that the study results shall only be used if the data suggests the water quality criterion should be lowered;
6. The level of mitigation flows for Des Moines Creeks [sic] is 1 CFS [cubic foot per second], below which mitigation is required;
7. The fill criteria are modified as follows:

 Antimony 5.79 mg/kg
 Arsenic 7 mg/kg
 Barium 12,000 mg/kg
 Beryllium .6 mg/kg
 Cadmium 1 mg/kg
 Chromium 42 mg/kg
 Copper 36 mg/kg
 Lead 24 mg/kg
 Mercury .07 mg/kg
 Nickel 48 mg/kg
 Selenium .52 mg/kg
 Silver .28 mg/kg
 Thallium 2 mg/kg
 Zinc 85 mg/kg
 TPH 0

8. The SPLP [Synthetic Precipitation Leaching Procedure] process may not be used to authorize the importation of fill that exceeds the modified fill criteria;
9. The minimum number of samples of the proposed fill shall be increased to reflect the number of samples required under MTCA [Model Toxics Control Act];
10. The performance standard for wetlands is modified so that the Port matches the hydroperiods of the wetlands pre- and post project, in order to assure the long-term maintenance and perpetuation of wetland characteristics, such as standing or flowing water, wetland resources, and wetland functions[;]
11. The Port shall mitigate for on-site wetland loss at the ratio of no less than 2:1. This ratio shall not include wetland buffers or preserving wetlands that are already protected. In order to meet this ratio, the Port is urged to consider enhancing the Walker Creek headwaters wetlands[;]
12. Condition (D)(1)(h) is modified so that if the future wetland delineations show the wetland boundaries have decreased, additional in-basin mitigation shall be required[;]
13. The language in the monitoring requirement of Condition E(3) is modified so that in the event monitoring detects exceedances of the water quality criteria in either surface or groundwater. Ecology shall take action to eliminate the exceedances. This may include a revision to the fill criteria and/or corrective action;
14. The monitoring duration in Condition B (and its cross references to E(3) and F(1)) shall continue for at least 8 years from the conclusion of construction and, should monitoring reveal exceedances, Ecology shall further extend the period of monitoring;
15. The monitoring in Condition F(1) is modified so that monitoring continues for as long as there are contaminants in the AOMA [Airport Operations and Maintenance Area];
16. The Port shall obtain a water right to use water as proposed mitigation under the Low Flow Plan.
PCHB Dec. at 135-38.
[3] Conditions 1-4, conditions 9-10, condition 11 sentences 1 and 2, and conditions 12-15 are all unchallenged.
[4] The Army Corps of Engineers' record of decision for the § 404 permit adopts PCHB conditions 1-4, 9, 15, and 16. Dep't of the Army, Record of Decision for Port of Seattle (XXXX-X-XXXXX), available at www.nws.usace.army.mil/publicmenu/DOCUMENTS/ST-rod.pdf at 25-28. With regard to condition 16, the Army Corps will require the Port to obtain a water right "if necessary." Id. at 28.
[5] The term "water quality standards" includes state-adopted water quality standards. 40 C.F.R. § 121.1(g).
[6] Although Ecology has since amended Washington's surface water quality standards, see Wash. St. Reg. XX-XX-XXX (July 16, 2003), these amendments cannot be used for federal Clean Water Act actions until the United States Environmental Protection Agency (EPA) has approved the new rules. Wash. St. Reg. XX-XX-XXX, at 72. Moreover, this court must evaluate whether the PCHB correctly found reasonable assurance under the standards in place at the time of the § 401 certification. Thus, this court must apply the water quality standards contained in former chapter 173-201A WAC.
[7] The term "scope of review" has been used to refer to many different concepts in the context of administrative law. It has been used to mean the range of the legal issues that a decision-making body has the power to address in light of legislative or other restrictions. See William R. Andersen, The 1988 Washington Administrative Procedure ActAn Introduction, 64 WASH. L.REV. 781, 831 (1989). The term has also been used interchangeably with "standard of review" to refer to the intensity of review applied to a decision below. Id. In this case we use the term "scope of review," as the PCHB uses it, to refer only to the scope of evidence that the PCHB can consider when reviewing an Ecology § 401 certification.
[8] Ecology argues that because amended WAC 371-08-485(1) took effect in the middle of the PCHB hearing, this court should not consider the amended language. However, the purpose of the amendment was clarification; "[t]he substance of the amendment has not changed." Wash. St. Reg. XX-XX-XXX, at 13 (Mar. 20, 2002).
[9] It is important to note that this de novo scope of review, as we use the term in this opinion, speaks only to the scope of evidence that the PCHB must review on appeal of a § 401 certification. See, supra, part IV.A.2. Therefore, this holding does not conflict with part IV.A. 1. of this opinion. Given the statutory roles of the two agencies, the de novo standard of review does not allow the PCHB to add conditions to a § 401 certification without first finding that Ecology's § 401 certification is deficient in a particular respect.
[10] Even though the language at issue is part of a federal regulation, Ecology, as Washington's certifying agency, is the agency charged with administration of that provision in Washington.
[11] SeaTac's most recent NPDES permit became effective on October 1, 2003 and will expire on September 4, 2008. NPDES Waste Discharge Permit No. WA-002465-1 available at http://www.ecy.wa.gov/programs/wq (last visited May 12, 2004). Although this most recent NPDES permit explicitly requires compliance with state water quality standards, NPDES Permit No. WA-002465-1, supra, at 43, the new NPDES permit was not part of the record before the PCHB. Because this court is limited to review of the record before the PCHB, RCW 34.05.562, we will not consider the new NPDES permit as evidence of reasonable assurance. The ACC and CASE motion to strike references to the new NPDES permits from the briefs is granted. However, we find no reason to impose sanctions.
[12] Although ACC and CASE argue that this policy was not in effect at the time that the § 401 certification was issued, Ecology acted consistently with its principles and the PCHB noted the policy in its decision.
[13] ACC and CASE also move to strike appendix B of Ecology's response brief, which includes a 1998 stipulation and agreed order for dismissal regarding ACC's challenge to the last NPDES permit. Ecology does not ask us to take judicial notice of the contents of the stipulation and agreed order. Ecologys Resp. at 7. Instead Ecology cites to the stipulation and agreed order only to support the proposition that ACC and CASE can appeal NPDES permitting decisions, and CASE has exercised its ability to do so. Therefore, we merely recognize that the proceeding occurred without taking judicial notice of the contents of appendix B.
[14] Cfs means a flow calculated in cubic feet per second.
[15] According to the modeling, Walker Creek and Des Moines Creek flows would be impacted by the third runway, but Miller Creek flows would not. Therefore, Miller Creek needs no low flow mitigation. PCHB Dec. at 47.
[16] Although it was not an issue raised by the parties, there was some question at oral argument as to the quality of stormwater to be released from the detention vaults. Stormwater release must comply with water quality standards for turbidity, temperature, dissolved oxygen, and metals. Moreover, Ecology has required water quality testing at each vault outflow and at 100 feet downstream of each outflow so that problems can be detected and adaptive management can be implemented. There has been no challenge to the Port's plan for ensuring the quality of the water released from the vaults.
[17] As an initial matter, the Port argues that ACC may not raise this particular argument for the first time on appeal. However, ACC's argument to the PCHB about the inadequacy of the low flow mitigation plan was general enough to encompass this issue.
[18] ACC and CASE did not specifically assign error to the PCHB's conclusions about the adequacy of the Port's low flow modeling in their opening briefs. In the combined response brief, ACC clearly stated that ACC "did not assign error" to the PCHB's findings regarding the Port's low flow modeling: Combined Resp. Br. of ACC and CASE at 94 n. 209. However, ACC and CASE argue for the first time in their reply brief that this court should hold that the PCHB's approval of the low flow modeling is not supported by substantial evidence. We do not consider this argument because ACC and CASE did not assign error to this PCHB conclusion prior to their reply brief. See RAP 10.3(c). Because we decline to address this issue, ACC and CASE's motion to strike all references in the Port's response to specific testimony regarding low flow modeling is now moot.
[19] Although ACC and CASE argue that modeling deficiencies justify a margin of error for Des Moines Creek, the PCHB explicitly approved calibration of the models.
[20] Section 401 certification requires reasonable assurance that the third runway project will comply with the water code. Elkhorn I, 121 Wash.2d at 192, 849 P.2d 646 (Clean Water Act requires compliance with water quality standards and other appropriate requirements of state law).
[21] There are exceptions to the water right requirement, none of which applies here. See, e.g., RCW 90.03.252; RCW 90.46.120, .150.
[22] ACC and CASE contend that the Port is attempting to create an exception to the statutory water right requirement. In fact, the Port seems to argue that its plan does not meet the threshold requirement that it involve "use" of state water. Thus, the Port does not argue for an exception but rather that the statutory requirement does not apply in the first place.
[23] Amended by Laws of 2003, ch. 329, § 1 (relevant language remains identical).
[24] While the PCHB concluded that a water right would also give the State clear authority to limit the use of the detained stormwater only for low flow augmentation, the § 401 certification is an independently enforceable order. Thus, Ecology already has a clear, independent mechanism available for enforcing the low flow offset plan.
[25] ACC and CASE have filed a motion to strike Ecology's answer to CELP's amicus brief. They argue that Ecology waived its opportunity to discuss the water right issue when it failed to raise the issue in its opening brief. However, any party can respond to an amicus brief by filing an answer, and RAP 10.3(f) requires only that answers "should be limited solely to the new matters raised in the brief of amicus curiae." RAP 10.3(f). Ecology's answer complies with this rule and the motion to strike is denied. ACC and CASE also request permission to file a reply to what they characterize as new arguments raised by Ecology. However, we find no need for ACC and CASE to file a reply.
[26] On a related note, there is no need to ensure that the Port's use of stormwater will not impact downstream water rights because the very nature of the Port's project is to maintain the existing hydrology.
[27] Although there is another table in the § 401 certification at AR 7458, the one contained in attachment E to the § 401 certification sets the applicable Ecology criteria.
[28] In addition, the PCHB determined that the number of samples of potential fill to be tested was inadequate. The PCHB adjusted the sampling requirements to match those found in the MTCA Method A standards. Ecology does not challenge the increased sampling requirements, which therefore stand.
[29] Although ACC also refers to United States v. Klein, 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1871), the Klein holding has been severely limited. See Haberman v. Wash. Pub. Power Supply Sys., 109 Wash.2d 107, 143-44, 744 P.2d 1032, 750 P.2d 254 (1987).
[30] Finally, the Environmental Organizations, in the context of a discussion of chapter 210, argue that Judge Rothstein's decision in Graves was improperly decided. The Environmental Organizations also contend that Ecology erred when it failed to incorporate the PCHB's conditions immediately upon the PCHB decision. Ecology has filed a motion to strike these portions of the Environmental Organizations' brief because they are irrelevant to any issues presented to this court and beyond the scope of the points of error raised by the parties. This motion to strike has been passed to the merits.

The Environmental Organizations moved to appear as amici to address the constitutionality of chapter 210 in light of the separation of powers doctrine and preemption. Environmental Organizations' Mot. for Leave to Appear as Amici Curiae at 8. It is not clear how their challenge of Judge Rothstein's ruling relates to the constitutionality of chapter 210. It is also unclear how the timing of Ecology's incorporation of the PCHB's conditions relates to the constitutionality of chapter 210. Therefore, we grant Ecology's motion to strike and decline to consider these portions of the amici brief. See, e.g., State v. Gonzalez, 110 Wash.2d 738, 752 n. 2, 757 P.2d 925 (1988) ("[W]e have many times held that arguments raised only by amici curiae need not be considered.").
[31] Metals in stormwater can be particulate or dissolved. It is the dissolved fraction of metals that is bioavailable and therefore toxic.
[32] ACC and CASE refer to the Port's current exceedances of unadjusted water quality standards for copper and zinc claiming that, in light of these current exceedances. Ecology improperly allowed a WER study before following prerequisite steps listed in Ecology's permit writer's manual. This argument has been raised for the first time on appeal, and the PCHB does not refer to the manual in its discussion of the WER studies. Still, because Ecology's permit writer's manual has not been adopted as regulation, Ecology's purported failure to follow the steps does not justify altering the application of the WER study.
[33] Despite the PCHB decision, the Army Corps has required that the Port enhance wetland buffers. Graves, 280 F.Supp.2d at 1226.
[34] ACC and CASE have offered no alternative definitions for these terms.
[35] It is important to note that the PCHB ultimately held that "the Port's proposed wetland mitigation plan, as outlined in the NRMP, and as further conditioned by the Board, provides reasonable assurance there will be no loss of wetland functions." PCHB Dec. at 131. Even if no additional in-basin opportunities were viable, the out-of-basin plan could be successfully implemented. Therefore, in either case, the PCHB had reasonable assurance that the Port would ultimately comply with the antidegradation policy.
[36] The Port does not argue that the PCHB's decision to subtract credits for buffer enhancements, Lora Lake, and already preserved wetlands was improper. The Port only contests the PCHB's refusal to count its out-of-basin mitigation.
[37] We recognize that each party in this case has raised multiple arguments in support of its position. While this court has considered all issues raised by the parties in their briefs, in the interests of economy, we have included only the discussion we found necessary to explain the resolution of this case.