IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| CARLA J. SWANSON, | ) | No. 79084-6-I |
| | ) | |
| Appellant, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| DEPARTMENT OF SOCIAL AND HEALTH SERVICES, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

HAZELRIGG, J. — Carla J. Swanson appears pro se seeking review of the Department of Social and Health Services' finding of physical abuse of a child and denial of a foster care license. She argues that the agency's decisions are invalid because they were not supported by substantial evidence. We find that substantial evidence supports the finding of physical abuse and the denial of a foster care license and affirm.

FACTS

In February 2015, Carla Swanson applied to the Department of Social and Health Services (DSHS) for a foster family home license. At the time, she did not hold a license but was serving as a "suitable person placement" for three dependent children: S.V., then four years old; B.V., then five years old; and M.M.,

then ten years old. Although she was not biologically related to the children, they referred to her as "Auntie."

On August 5, 2015, while the licensing application was still pending, Swanson dropped off the two younger children at day care around 5:40 a.m. Gina Vogel worked at the day care center and was S.V.'s teacher. Vogel was tickling S.V., who was sitting on her lap, when she noticed a mark on the child's neck. Vogel asked S.V. how she had gotten the mark, and S.V. said, "My auntie hurt me on the throat." Vogel filled out an incident report at around 6:30 a.m.

When the director of the day care, Tiffany Gorski, arrived around 6:45 a.m., Vogel informed her of what S.V. had said. Gorski saw a red bruise across S.V.'s neck and thought it looked like blood vessels had been broken. When Gorski asked S.V. what had happened, S.V. responded, "Auntie hold me on the floor." Gorski asked S.V. to show them what had happened using a doll. S.V. slammed the doll to the table with her hand on its neck and yelled at it. Gorski asked what the doll's name was, and S.V. responded with her own name. Gorski asked who was yelling at the doll, and S.V. responded, "Auntie." The teachers called Child Protective Services (CPS), which also notified law enforcement.

Sheila Green was the CPS investigator assigned to this case. Green received an intake form the same day describing S.V.'s disclosure to her teachers and a separate allegation by M.M. that Swanson had thrown shoes, books, and videos at her, then made her clean up broken glass. Green reviewed Swanson's CPS history and found three or four other reports of Swanson speaking harshly to

the children or yanking them, but the previous reports had not resulted in founded findings of abuse.

Green interviewed S.V. around 2:30 p.m., but the child was difficult to understand and Green did not think she understood the directions she was given. Green asked S.V. how she had gotten the mark on her neck. S.V. gave a number of responses, including that she had gotten the mark from Joey, Gina, and Auntie. At one point, she said that it happened on the kitchen floor and that Misty had seen it happen. Misty was the dog. Green tried to get S.V. to demonstrate what had happened using a teddy bear, but S.V. did not demonstrate the event. Green took photographs of the mark on S.V.'s neck. Green stated that she did not give much weight to the interview because S.V. made multiple conflicting statements, the interview was interrupted a number of times, and Green did not believe that S.V. understood the directions.

The next morning, Detective Curtis Haberlach of the Everett Police Department received the report of S.V.'s disclosure and initiated an investigation. Haberlach took a statement from Gorski and interviewed Swanson. Swanson told him that she was the primary caregiver and would have been the one to help S.V. get dressed in the morning, but she said she had not noticed the mark on S.V.'s neck. In response to Haberlach's questions about the events the previous morning before Swanson dropped off the children at day care, she gave only vague, general statements about their normal morning routine. Haberlach noted that she denied the allegations of yelling at the children and calling them names but did not appear surprised by the accusations. He did not find Swanson to be believable.

Two doctors separately assessed the photographs of S.V.'s neck and opined that the marks were consistent with the scenario S.V. had described to her teachers. Dr. Frances Chalmers, a pediatrician and consultant for DSHS, was provided with the photographs of S.V. and an explanation of her disclosures. She did not examine S.V. in person. Chalmers observed little red dots on the front of the child's neck that appeared consistent with a type of bruising called petechia. This type of bruising was more consistent with an object being "pressed against the neck . . . somewhat forcibly . . . and/or rubbing back and forth with pressure" than with a blunt injury like an object falling on her or falling against something, which would have "caused a more delineated line, mark, or bruise." She noted that the front of the neck was an unusual place on the body for an accidental injury. Chalmers rated her certainty that the mark showed petechial bruising rather than a rash as seven to eight out of ten.

Dr. Emily Brown, a pediatrician and Child Abuse and Neglect Fellow at Seattle Children's Hospital, also served as a consultant for DSHS. Brown was asked to review five photographs of S.V. and was provided with information about the disclosure that S.V. had made to her teachers. Brown noted that the front of the neck was a very unusual place to sustain an accidental injury. She also noticed petechia on S.V.'s neck, which she found "very concerning for compression injury, such as you might see in cases of strangulation." She did not believe that an adult or child pulling on the back of S.V.'s shirt would cause enough compression to cause petechia. Brown also opined that she did not think the straps of a car seat could have caused the injury.

In November 2015, DSHS informed Swanson that it had determined the allegation of physical abuse to be founded.  Swanson requested and received an administrative review of the finding, which was upheld.  DSHS also denied Swanson's foster care license application.  Swanson requested a hearing to challenge both the finding and the denial with the Office of Administrative Hearings. After a three-day hearing,[1] the administrative law judge (ALJ) affirmed both the finding and the denial.

Swanson petitioned for review to the DSHS Board of Appeals.  The reviewing judge for the Board of Appeals entered numerous findings of fact, including the following:

> 31. Based on the evidence presented, the undersigned finds the most credible evidence of what occurred to be [S.V.]'s report that aunty hurt her neck on the floor of the kitchen. In making this finding, the undersigned need not determine these facts beyond a reasonable doubt, as is required in a criminal case. Instead, the facts are determined based on what most likely occurred, a more likely than not standard.

> 32. Based on this credibility finding, the undersigned finds that on or about August 4, 2015, the Appellant caused injury to [S.V.] by holding [S.V.] by her neck on the kitchen floor of their residence. The Appellant held [S.V.] with sufficient force and for a sufficient period of time to cause bruising and broken capillary blood vessels (petechia) on [S.V.]'s throat. This injury was visible in photographs taken several hours later and was, more likely than not, visible days after it occurred. Based on the circumstances and the testimony of the medical experts the undersigned finds that the infliction of injury on [S.V.] by the Appellant was not accidental.

---

[1] The transcript of this hearing is not included in its entirety in the record before this court. The testimony of Vogel, Gorski, and Cory Swanson is not part of the record on appeal. However, the Board of Appeals' unchallenged findings of fact regarding this testimony are taken as true for the purposes of this appeal. See Darkenwald v. State, Emp't Sec. Dep't, 183 Wn.2d 237, 244, 350 P.3d 647 (2015).

The Board of Appeals affirmed the ALJ's initial orders and denied Swanson's subsequent request for reconsideration. Swanson then petitioned for judicial review in superior court, which affirmed the agency's rulings. She appealed.

ANALYSIS

Swanson appears pro se to challenge the founded finding of physical abuse and the denial of her foster care license application. Swanson does not specifically identify the basis for her challenge to the administrative action, but she states in her briefing that "[s]ubstantial evidence does not support the allegations of any abuse." We interpret this as an argument that substantial evidence does not support the findings of fact stating that Swanson had more likely than not caused injury to S.V. in the manner she described to her teachers.

I.      Standard of Review

The Administrative Procedure Act (APA)[2] governs judicial review of agency decisions. RCW 34.05.510; Hardee v. State, Dep't of Soc. & Health Servs., 172 Wn.2d 1, 6, 256 P.3d 339 (2011). When an aggrieved party seeks appellate review of a final agency order, the appellate court sits in the same position as the superior court. Campbell v. State Emp't Sec. Dep't, 180 Wn.2d 566, 571, 326 P.3d 713 (2014). Rather than the decision of the ALJ or the superior court, we review the final decision of the agency—in this context, the final order issued by the DSHS Board of Appeals. Verizon Nw., Inc. v. Wash. Emp't Sec. Dep't, 164 Wn.2d 909,

---

[2] Chapter 34.05 RCW.

915, 194 P.3d 255 (2008). The party challenging the validity of an agency's action bears the burden of demonstrating its invalidity. RCW 34.05.570(1)(a).

The APA lists nine grounds for challenging an agency order or decision. RCW 34.05.570(3). Among other scenarios, a party is entitled to relief from an agency order in an adjudicative proceeding if we determine that the order is not supported by evidence that is substantial when viewed in light of the whole record. RCW 34.05.570(3)(e).

We review administrative findings of fact for substantial evidence. Darkenwald v. State, Emp't Sec. Dep't, 183 Wn.2d 237, 244, 350 P.3d 647 (2015). Substantial evidence supports an agency decision or order when a sufficient quantity of evidence exists to persuade a fair-minded person of the truth or correctness of the order. Hardee, 172 Wn.2d at 7. "Even if there are several reasonable interpretations of the evidence, it is substantial if it reasonably supports the finding." Rogers Potato Serv., L.L.C. v. Countrywide Potato, L.L.C., 152 Wn.2d 387, 391, 97 P.3d 745 (2004). We do not re-weigh the evidence or judge the credibility of witnesses. Port of Seattle v. Pollution Control Hr'gs. Bd., 151 Wn.2d 568, 588, 90 P.3d 659 (2004). Unchallenged findings of fact are treated as true on appeal. Darkenwald, 183 Wn.2d at 244.

II. Finding of Abuse

In 2015, DSHS was the agency responsible for investigating reports of child abuse and neglect.[3] Former RCW 26.44.050 (2012), amended by Laws Of 2017,

---

[3] In 2017, the legislature created the Department of Children, Youth, and Families, which now responds to reports of child abuse or neglect. Laws of 2017, 3d Spec. Sess., Ch. 6, § 101.

3d Spec. Sess., ch. 6, § 324. After receiving a report of alleged abuse or neglect, the responding agency may conduct a formal investigation into the allegations to determine whether the report was founded or unfounded. RCW 26.44.030(12)(a), (13)(a). When the department determines that the child abuse or neglect more likely than not occurred, the report is determined to be founded. RCW 26.44.020(13). If the department determines that the abuse or neglect more likely than not did not occur, or if there is insufficient evidence to determine whether the alleged abuse or neglect occurred, the report is classified as unfounded. RCW 26.44.020(28). An alleged perpetrator may request agency review of a founded finding of abuse or neglect by a management-level staff member. RCW 26.44.125(1), (4). If the agency upholds the finding, the alleged perpetrator may request an adjudicative hearing to contest the finding. RCW 26.44.125(5).

"Abuse or neglect" is defined as "sexual abuse, sexual exploitation, or injury of a child by any person under circumstances which cause harm to the child's health, welfare, or safety, excluding conduct permitted under RCW 9A.16.100; or the negligent treatment or maltreatment of a child by a person responsible for or providing care to the child." RCW 26.44.020(1). Physical discipline of a child is excluded from this definition if it is "reasonable and moderate and is inflicted by a parent, teacher, or guardian for purposes of restraining or correcting the child." RCW 9A.16.100. Some disciplinary actions are presumed unreasonable, including interfering with a child's breathing and any act that causes bodily harm greater than transient pain or minor temporary marks. Id.

The Washington Administrative Code uses the same definition of abuse detailed in RCW 26.44.020 for purposes of CPS investigations and supplies additional guidance to determine what constitutes child abuse. WAC 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, -0030. It specifically defines "physical abuse" as "the nonaccidental infliction of physical injury or physical mistreatment on a child that harms the child's health, welfare, or safety." WAC 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(1). Physical discipline of a child is not considered abuse when reasonable and moderate and inflicted by a parent or guardian. WAC 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(2). Multiple factors inform whether the bodily harm is reasonable and moderate, including the age, size, and condition of the child; the location of any injury; the developmental level of the child; and the nature of the child's misconduct. Id. "A parent's belief that it is necessary to punish a child does not justify or permit the use of excessive, immoderate or unreasonable force against the child." Id.

Here, substantial evidence supported the finding that the report of physical abuse of a child was founded. Although S.V. did not repeat her disclosure to Green, her initial account to her teachers of how she had obtained the injury was specific and unprompted. Additional details given in her interview with Green corroborated this initial story, such as that the incident occurred in the kitchen and Misty, the dog, was there when it happened. Both consulting doctors testified with confidence that the photographs of the mark on S.V.'s neck showed petechial bruising caused by sustained compression rather than a rash. Both also noted that the location of the mark was not typical for an accidental injury. They agreed that the injury was consistent with the account that S.V. had given to her teachers.

There was substantial evidence that Swanson more likely than not intentionally caused injury to S.V. by holding her by the neck on the kitchen floor with sufficient force and for sufficient time to cause petechial bruising on S.V.'s throat.

This also supports the conclusion that Swanson more likely than not committed physical abuse of a child. Non-accidental physical force is presumed unreasonable if it interferes with a child's breathing or causes greater than minor temporary marks. The mark on S.V.'s throat was visible for at least nine hours after the injury occurred, and the level of force was consistent with a compression injury such as you might see in cases of strangulation. Regardless, it is questionable whether holding a four-year-old child on the floor by the neck with enough force to leave bruising is not a reasonable and moderate form of physical discipline. The findings of fact support the conclusion that the report that Swanson committed physical abuse of a child was more likely than not founded.

III.    Denial of Foster Care License

On review, the decision to deny a foster family home license shall be upheld if there is reasonable cause to believe that the applicant "lacks the character, suitability, or competence to care for children placed in out-of-home care" or has failed to comply with the applicable statutes governing foster care licenses. RCW 74.15.130(2). The department may deny a foster home license to a person that it has determined to have abused or neglected a child. WAC 110-148-1625(1)(c).

As noted above, there is substantial evidence of the finding that Swanson physically abused a child. This supports the conclusion to deny her application for a foster home license and also provides reasonable cause to believe that Swanson

lacks the character, suitability, or competence to serve as a foster parent. The decision to deny her application for a foster family home license is upheld.

Affirmed.

WE CONCUR: